UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
UNITED STATES OF AMERICA

    v.                                                                              Hon. Jed S. Rakoff

MONZER AL KASSAR,
TAREQ MOUSA AL GHAZI, and                           S3 07 Cr. 354 (JSR)
LUIS FELIPE MORENO GODOY

    Defendants
------------------------------------------------------------------X

MEMORANDUM OF LAW OF DEFENDANT TAREQ MOUSA
AL GHAZI IN REPLY TO THE GOVERNMENT'S RESPONSE

MARC AGNIFILO, ESQ.
*Attorney for Tareq Mousa al-Ghazi*
Brafman & Associates, P.C.
767 Third Avenue
New York, New York  10017
(212) 750-7800
Magnifilo@braflaw.com

CONTENTS

(page)

1. The Issues In This Case Are Ones Of First Impression And The Court Should Develop A Meaningful Due Process Analysis Where Defendants Are Arrested In Over-Reaching, International "Sting" Investigations . . . . 1

2. The Government's Investigation Was Over-Reaching . 2

3. The Government Manufactured Federal Jurisdiction . . 5

4. Insufficient Nexus . . . . . . 6

   A. The Government Created the Nexus . . . 6

   B. The Nexus Is Too Indirect . . . . 7

5. Defendants Lacked Fair Warning That U.S. Law Applied To These Acts . . . . . . 8

6. Application Of These Laws To Al-Ghazi Is Arbitrary And Unfair . . . . . . . 8

   A. The Government's Selection of al-Ghazi Was Arbitrary 8

   B. An Unprecedented Expansion Of U.S. Criminal Jurisdiction Should Not Be Applied to These Facts . . . . . . 9

7. Conclusion . . . . . . . 10

## TABLE OF AUHTORITIES

(Cases)                                                                              (Page(s))

Burger King v. Rudzewicz, 471 U.S. 462 (1985).                .        .        7

City of New York v. Beretta U.S.A. Corp, __ F.3d __,
2008WL1884167 (C.A. 2(N.Y.)    .        .        .        .        8

Hanson v. Denckla, 357 U.S. 235 (1958).        .        .        .        7

The Schooner Exch. v. M'Fadden, 11 U.S. (7 Cranch) 116 (1812)        9

United States v. Bin Laden, 92 F.Supp.2d 189, 219-220 (2000).        6, 7, 8

United States v. Cafiero, 242 F.Supp.2d 49 (D. Mass. 2003)        .        6

United States v. Cardales, 168 F.3d 548 (1st Cir. 1999)        .        .        7

United States v. Chin, 934 F.2d 393 (2d Cir. 1991)        .        .        2, 5

United States v. Davis, 905 F.2d 245, 249 (9th Cir. 1990)        .        6

United States v. Gambino, 566 F.2d 414 (2d Cir. 1977)        .        .        5

United States v. Lakhani, 480 F.3d 171 (3d Cir. 2007)        .        .        2, 3, 4

United States v. LaPorta, 46 F.3d 152 (2d Cir. 1994)        .        .        2, 4

United States v. Lau Tung Lam, 714 F.2d 209 (2d Cir. 1983)        .        5

United States v. Myers, 692 F.2d 823 (2d Cir. 1982)        .        .        2

United States v. Rahman, 189 F.3d 88 (2d Cir. 1999)        .        .        2

United States v. Schmidt, 105 F.3d 82 (2d Cir. 1997)        .        .        2, 4

United States v. Suerte, 291 F.3d 366 (5th Cir. 2002)        .        .        7

United States v. Wallace, 85 F.3d 1063 (2d Cir. 1996)        .        .        6

United States v. Yousef, 327 F.3d 56, 111 (2d Cir. 2003).        .        6, 7, 8

(Treatises and Law Reviews)

Black's Law Dictionary (7th Ed.), West Pub., 1999.  .  .  9

Colangelo, Anthony J., Constitutional Limits On Extraterritorial
Jurisdiction: Terrorism and the Intersection of National
and International Law, 48 Harvard International Law Journal,
121 (Winter 2007), p. 129.  .  .  .  .  .  9, 10

Restatement (Third) of Foreign Relations Law of the
United States, Sec. 401(b)(1987) .  .  .  .  .  9


(Other Briefs)

Government's Brief In Opposition to Defendant's Post
Trial Motion in U.S. v. Hemant Lakhani, District of New Jersey
Criminal No. 03-880 (KSH), Document 94  .  .  .  3

1.  **The Issues In This Case Are Ones of First Impression And The Court Should Develop A Meaningful Due Process Analysis Where Defendants Are Arrested In Over-reaching, International "Sting" Operations**

The Government's Memorandum In Opposition To Defendant's Motions To Dismiss And For Other Relief (hereinafter "Gov. Br.") and the cases cited in it underscore the premise that the issues in this case are ones of first impression. First, the issue of how the American legal system should regard a government sting operation in another country against a person with no contacts to the U.S. whom the government knows has not violated any U.S. law at the time the sting operation is launched is an issue of first impression. Second, the issue of how our legal system should regard a sting operation where the U.S. Government executes a classic "bait and switch" on a non-U.S citizen located abroad, tricking him into being involved, however minimally, in an illegal arms deal it first touted as legal is also one of first impression. No cases have been, or could be, cited in the Government's Brief that guide this Court in addressing this unique situation.

Therefore, in the absence of precedent, defendants ask this court to conduct a due process analysis, following a hearing, by focusing on five issues: (1) whether the Government over-reached in creating the charged United States offenses and violated defendants' due process rights; (2) whether the Government improperly manufactured federal jurisdiction and the extraterritorial applicability of the charged statutes; (3) whether a constitutionally-sufficient nexus was lacking between the defendants and the United States absent the Government's efforts to create one; (4) whether the defendants lacked fair warning that their conduct violated U.S. law; and (5) whether application of

1

U.S. law here would be arbitrary or fundamentally unfair.[1] If the answer to any of the five questions above is "yes," defendants request that this court dismiss the indictment, or any offending count, under the Fifth Amendment Due Process clause.

2. The Government's Investigation Was Over-reaching

The cases cited by the Government as supporting the legality of its investigation - United States v. Rahman, 189 F.3d 88 (2d Cir. 1999); United States v. Chin, 934 F.2d 393 (2d Cir. 1991); United States v. Myers, 692 F.2d 823 (2d Cir. 1982); United States v. Schmidt, 105 F.3d 82 (2d Cir. 1997); United States v. LaPorta, 46 F.3d 152 (2d Cir. 1994) and United States v. Lakhani, 480 F.3d 171 (3d Cir. 2007) - are in fact each readily distinguishable from the facts of this case, as indicated below.

United States v. Rahman, 189 F.3d 88 (2d Cir. 1999) is distinguishable because there, by the time the government operative infiltrated the terrorist organization, the conspiracy was already well under way with the commission of several overt acts such as the killing of Rabbi Meir Kahane in Manhattan in November 1990 and the bombing of the World Trade Center in February 1993. Id. at 104. In contrast, here, nothing happened until the Government got involved; the Government created the associations and the crimes it now seeks to prosecute. Specifically, al-Ghazi contacted al-Kassar solely at the government's repeated prompting, and only to further an arms deal that was then portrayed as entirely lawful. Absent the government's involvement in this case, nothing in the indictment would ever have happened; there would have been no crimes,

---

[1] The fifth part of the proposed analysis was not explicitly raised in defendant's original memorandum insofar as the concept of arbitrariness is built into the other four parts of the test, each of which were explicitly addressed. However, for reasons set forth below, analyzing the arbitrariness of the laws' applicability to a certain defendant should be conducted independently of the other four considerations.

2

no conspiracy, no trips to Spain or Romania; there would have been no talk of missiles, rifles or other weapons with al-Kassar or anyone else. In short, without the U.S. Government approaching a non-U.S. citizen at his home in Lebanon without the slightest suspicion he had done or would do anything wrong, al-Ghazi would have grown old with his family and would never have been implicated in a crime against the U.S. or any other country. In its submission, the Government has not suggested otherwise.

The Government also states this case is "strikingly similar" to Lakhani, 480 F.3d at 171 (See Gov. Br., 7). However, four major factual distinctions show that the two cases are not similar at all. First, whereas the government here initiated contact with al-Ghazi, in Lakhani, "the government did not initiate contact with Lakhani. Lakhani contacted the government informant on the advice of a terrorist, Abdul Qayyum, who was wanted for a series of bomb blasts in India in 1993 (the Mumbai Blasts) which killed more than 120 people." See Government's Brief In Opposition to Defendant's Post Trial Motion in U.S. v. Hemant Lakhani, District of New Jersey Criminal No. 03-880 (KSH), p. 22.[2] Second, at the **very first meeting**, the government informant made clear to Lakhani that their arms deal was purely **illegal**, Id. at 4-6, whereas here, the Government pulled a classic "bait and switch" by initially telling al-Ghazi the deal was legal and only after he became involved told him it was illegal. Third, Lakhani, with his own funds, flew to the United States four times and the Ukraine and Russia a dozen times for meetings related to weapons sales with three arms suppliers "which he (Lakhani) located on his own," Id. at 4-6, 23, whereas here, the Government directed al-Ghazi to contact al-

---

[2] The Government's post-trial brief to Judge Katharine S. Hayden who presided over the lengthy trial of U.S. v. Lakhani is far more detailed than is the Third Circuit opinion. The Government's brief can be found on PACER at District of New Jersey; Crim. No. 03-880; Document 94.

3

Kassar, and then directed and paid for al-Ghazi's travel to Spain and later Romania. Fourth, "Lakhani ..repeatedly volunteered advice on how to carry out an attack on American soil," Id. at 24, whereas here, no strategies, plots or ideas for anti-American attacks emanated from al-Ghazi, who at most politely responded to the incessant entreaties of the DEA informants. In sum, while Lakhani appeared to be a legitimate aspiring terrorist and arms-dealer, al-Ghazi was little more than a puppet being manipulated by the DEA in its well-orchestrated quest to arrest al-Kassar,.

Yet another major distinction is that the most significant meeting between the informant and Lakhani took place at Newark Liberty International Airport, very much within the territorial confines of the United States. Lakhani could hardly be surprised, therefore, when the U.S. Government sought to apply U.S. law to his conduct. Likewise, his presence in New Jersey created a clear nexus between him and the U.S. For these reasons, among others, Lakhani is easily distinguished.

The other cases cited by the Government are likewise distinct. In LaPorta,[3] defendants were members of a small ring that set fire to cars and mailed in claims for insurance proceeds. Before the FBI informant infiltrated the group, it had already set fire to one car and collected the insurance money. By conducting a sting operation to have the arsonists set fire to a second car, the Government was not itself creating crimes and enlisting the defendants' complicity as much as providing an opportunity to commit the same crimes – arson and insurance fraud - the group had been committing. Schmidt is distinct because there the defendant conceived of the plot to escape from prison and to kill federal agents, and the government merely presented defendant with the means to

---

[3] In LaPorta, the Second Circuit again expressed its preference for a pre-trial hearing where disputed facts exist, Id. at 160.

seemingly accomplish her planned criminal endeavor. As in LaPorta, the architect of the criminal plot was the defendant, not the Government. In Chin, defendant's due process claim was that the agent created a pen-pal friendship with him, and that the Government then used that friendship to encourage him to possess child pornography. The case is distinct because the Government did not lure Chin into committing the crime by telling him, for instance, that child pornography was legal.

In sum, there is simply no precedent for the type of international "sting" operation that took place here. For the reasons set forth in defendant's original submission, the Government over-reached in this investigation.

3.  The Government Manufactured Federal Jurisdiction

Aside from being merely present for the discussions between al-Kassar and the three Government operatives, the only role played by al-Ghazi was to introduce SNH to al-Kassar, at the prompting of SNH. Significantly, at the time of the introduction, the arms deal was represented to be lawful, and there had not yet been any mention of the FARC, or of killing Americans, or of Surface To Air missiles. The Government manufactured federal jurisdiction – or, put another way, manufactured extraterritorial applicability of the charged statutes – because after the introduction, the Government operatives intentionally introduced elements into the arms deal designed to transform it into various violations of U.S. criminal statutes. In other words, by the time the CSs portrayed themselves as FARC members, al-Ghazi had already committed himself to the arms deal and had already made the introduction to al-Kassar. Therefore, this case is distinct from LaPorta, 46 F.3d at 154, United States v. Lau Tung Lam, 714 F.2d 209 (2d Cir. 1983), United States v. Gambino, 566 F.2d 414 (2d Cir. 1977), and United States v.

Wallace, 85 F.3d 1063 (2d Cir. 1996) insofar as in each of these four cases the defendant committed a volitional unlawful act, whereas here the only act committed by defendant al-Ghazi was the introduction of al-Kassar to SNH, done at a time when the arms deal was represented to be entirely legitimate.

4.   Insufficient Nexus

The nexus between the defendants and the U.S. is insufficient in this case for two reasons. First, any such nexus was created by the DEA operatives, and not by the defendants. Second, regardless of how the nexus was created, the connection between the defendants and the U.S. interests is too indirect to justify the application of U.S. law to the defendants' conduct.

A.   The Government Created The Nexus

The Government does not dispute that under United States v. Yousef, 327 F.3d 56, 111(2d Cir. 2003), this Circuit recognizes a constitutional requirement that a sufficient nexus exist between the defendant and the forum of prosecution. However, the Government's implicit position that the DEA operatives may create the nexus required by the Fifth Amendment Due Process Clause has no support in case law[4] and is constitutionally suspect. Instead, defendants contend that a sufficient constitutional nexus, as contemplated by Yousef, 327 F.2d at 111, 112; United States v. Davis, 905 F.2d 245, 249 (9th Cir. 1990), and United States v. Bin Laden, 92 F.Supp.2d 189, 219-220 (2000), must come from defendants' own volitional, purposeful and meaningful activity

---

[4] This principle of a volitional-nexus has support, by analogy, in United States v. Cafiero, 242 F.Supp.2d 49 (D. Mass. 2003), where an Italian citizen possessed cocaine on board a flight from Mexico to Rome; when the defendant became belligerent with the flight crew, the plane was diverted to Boston, where the cocaine was found in the his possession. The court dismissed all charges on the grounds that the defendant had no intention of possessing cocaine in the U.S. and only did so because his flight was diverted there.

6

toward a particular forum, see Burger King v. Rudzewicz, 471 U.S. 462 (1985); Hanson v. Denckla, 357 U.S. 235 (1958); and that such nexus may not be created by the very Government seeking to use the nexus to bring a constitutionally-sound prosecution.

      B.     The Nexus Is Too Indirect

Yousef, 327 F.2d at 111, while establishing a nexus requirement, found a sufficient nexus based on the specific facts of that case. In finding that Ramzi Yousef's conspiracy to destroy a dozen U.S.-flag aircraft in order to "inflict injury on this country and its people and influence American foreign policy" comprised a sufficient nexus between him and the U.S., the court focused solely on the plainly anti-American nature of the widespread, murderous plot, Yousef, 327 F.3d at 111, 112. The court did not meaningfully review the role of nexus in a due process analysis, was silent on the relevance of customary international law,[5] and did not elaborate on the degree or directness of the connection needed to comprise a constitutionally sufficient nexus. Instead, the court cited only the facts of defendant's plot.

The nexus between the defendants' alleged plan here to supply weapons to Colombia to be used by the FARC in a struggle against the DEA is far more oblique and attenuated than that in either Yousef or Bin Laden. In particular, the act of supplying weapons to a purported paramilitary organization is considerably less direct than the attacks against U.S. interests in Yousef and Bin Laden. As a general matter, the weapons provider is in a vastly different legal posture than is the ultimate actor. For instance,

---

[5] Other courts have conducted a due process analysis by reference to principles of customary international law. See United States v. Cardales, 168 F.3d 548 (1st Cir. 1999)(due process upheld pursuant to "territorial principle" and "protective principle" of international law.); United States v. Suerte, 291 F.3d 366 (5th Cir. 2002)(narcotics trafficking is universally condemned by all civilized nations).

counsel was unable to locate a case where an illegal weapons seller was convicted of murder or murder conspiracy because the person to whom he sold the gun used it to kill another person.[6] In analyzing the sufficiency of a constitutional nexus, therefore, the Court should consider that the connection between the defendants and the U.S. interests here is indirect; and that several steps are required between the defendants' actions in selling weapons in Spain and a potential injury to an American located in Colombia.

5. <u>Defendants Lacked Fair Warning That U.S. Law Applied To These Acts</u>

The Court in <u>Bin Laden</u> relied on the spirit, if not the rule, of the universality principle when it stated that mass murder is illegal in every civilized nation; and that the defendants may not therefore claim surprise that their actions violated the laws of the U.S. <u>Id</u>. at 218. However, the facts of <u>Bin Laden</u>, where the charged defendants themselves blew up two American embassies, killing hundreds, are very different from those here, where defendants, at most, agreed to provide weapons. The arguments in 4.B above, that the nexus between the defendants and the U.S. was slight, applies here.

6. <u>Application Of These Laws To Al-Ghazi Is Arbitrary And Unfair</u>

    A. <u>The Government's Selection of al-Ghazi Was Arbitrary</u>

Application of these criminal laws to defendant al-Ghazi is arbitrary and fundamentally unfair because the Government targeted and approached him. Unlike defendants in <u>Yousef</u> and <u>Bin Laden</u> who volitionally attacked U.S. interests, embassies or airplanes, and distinguished themselves as deserving of U.S. prosecution, al-Ghazi did

---

[6] In fact, it is apparently not against the law for firearms sellers to engage in patently illegal conduct such as knowingly selling multiple guns to straw purchasers, causing thousands of crime guns to flood New York City and other urban areas, resulting in hundreds of shootings annually. See <u>City of New York v. Beretta U.S.A. Corp</u>, __ F.3d __, 2008WL1884167 (C.A. 2(N.Y.)

nothing more than answer his front door in Lebanon and make the lifetime mistake of inviting a DEA informant into his home. Had al-Ghazi instead shut the door on SNH, presumably some other nominal figure would have been targeted as a stepping-stone to al-Kassar. As will be shown at the pre-trial hearing, the Government's choice of al-Ghazi was arbitrary in that he had no recent business dealings with al-Kassar and was involved in no criminal activity. This is borne out by the fact that it took the Government almost a year and a half to stage the first meeting between al-Ghazi and al-Kassar.

        B.    An Unprecedented Expansion Of U.S. Criminal Jurisdiction Should Not Be Applied To These Facts

Criminal jurisdiction should not apply to al-Ghazi under these facts. As a general matter, jurisdiction is "a government's general power to exercise authority over all persons and things within its territory." Black's Law Dictionary 712 n.1 (7th Ed. 1999). If a state has no jurisdiction over a certain person it has no legal authority to subject that person to its laws and legal process. Restatement (Third) of Foreign Relations Law of the United States, Sec. 401(b)(1987). Historically, a state's jurisdiction is defined by its geographic territory. See The Schooner Exch., 11 U.S. (7 Cranch) at 136 ("The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself.").

The public policy behind an expansive interpretation of extraterritorial criminal jurisdiction does not apply to a government sting targeting someone not suspected of breaking any U.S. law. "International jurisdictional rules…presently provide for the extraterritorial extension of criminal law to foreign actors abroad where the state has some objective interest in protecting itself against their potentially harmful acts." Colangelo, Anthony J., Constitutional Limits On Extraterritorial Jurisdiction: Terrorism

and the Intersection of National and International Law, 48 Harvard International Law Journal, 121 (Winter 2007), p. 129.  Al-Ghazi simply was not involved in any harmful acts at the time the U.S. Government came to his home.  Instead of preventing a pending criminal act, or investigating a past one, the Government approached al-Ghazi to create one.  In the simplest terms, the U.S. Government has no business doing this to a law-abiding non-American living in Lebanon, and the Government should not be rewarded with the continuation of this prosecution.  Mr. al-Ghazi's Fifth Amendment rights have been violated by our Government and he, and his counsel, ask the Court to dismiss this case against him.

    7.    Conclusion

For these reasons, defendant moves to dismiss all charges.

                                              Respectfully submitted,

                                              Marc Agnifilo
                                              (MA-7195)
                                              Brafman & Associates, P.C.
                                              767 Third Avenue
                                              New York, New York 10017
                                              (212) 750-7800

Dated: May 19, 2008
       New York, New York

Hon.   Jed S. Rakoff
       Roger Stavis, Esq.
       AUSAs Leslie Brown, Boyd Johnson and Brendan McGuire
       Tareq Mousa al-Ghazi