# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :     **AFFIDAVIT IN SUPPORT OF**
                                        **REQUEST FOR EXTRADITION**
          -v.-                    :
                                        S3 07 Cr. 354 (JSR)
MONZER AL KASSAR,                 :
     a/k/a "Al Munawar,"
     a/k/a "El Taous,"            :
TAREQ MOUSA AL GHAZI, and
LUIS FELIPE MORENO GODOY,         :

          Defendants.            :

- - - - - - - - - - - - - - - x

    I, WILLIAM BROWN, being duly sworn, hereby depose and state:

### INTRODUCTION

    1.    I am a citizen of the United States.

    2.    I am a Special Agent with the United States Drug

Enforcement Administration ("DEA").  The DEA conducts

investigations involving crimes against the United States,

including narcotics-trafficking, terrorism, and money-laundering

offenses.  Based on my training and experience, I have become

knowledgeable about criminal activity, particularly violations of

the federal narcotics-trafficking, terrorism, and money-

laundering statutes.

    3.    My duties as a DEA Special Agent include the

investigation of MONZER AL KASSAR ("AL KASSAR"), TAREQ MOUSA AL

GHAZI ("AL GHAZI"), and LUIS FELIPE MORENO GODOY ("MORENO") in

the case of <u>United States v. Monzer Al Kassar, Tareq Mousa Al</u>

Ghazi, and Luis Felipe Moreno Godoy.  As one of the investigative agents for this case, I am familiar with the facts of the investigation involving the criminal activities of these three defendants.

4.  AL KASSAR, AL GHAZI, and MORENO are charged in a five-count Third Superseding Indictment, dated June 21, 2007 (the "Third Superseding Indictment").  Count One charges AL KASSAR, AL GHAZI, and MORENO with conspiracy to murder U.S. nationals, in violation of Title 18, United States Code, Section 2332(b). Count Two charges AL KASSAR, AL GHAZI, and MORENO with conspiracy to kill U.S. officers and employees, in violation of Title 18, United States Code, Sections 1114 and 1117.  Count Three charges AL KASSAR, AL GHAZI, and MORENO with conspiracy to acquire and use a missile system designed to destroy aircraft, in violation of Title 18, United States Code, Section 2332g.  Count Four charges AL KASSAR, AL GHAZI, and MORENO with conspiracy to provide material support or resources to a designated foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B.  Count Five charges AL KASSAR and MORENO with conspiracy to commit money laundering crimes, in violation of Title 18, United States Code, Section 1956(a)(3).  AL KASSAR, MORENO, and AL GHAZI are also charged in the Third Superseding Indictment with criminal forfeiture pursuant to Title 18, United

States Code, Section 981(a)(1)(G). The forfeiture allegation against AL KASSAR seeks forfeiture of, among other assets, AL KASSAR's estate in Marbella, Spain, and funds in bank accounts in Spain and Lebanon that AL KASSAR and his co-defendants used to facilitate the terrorism crimes charged in the Third Superseding Indictment. Criminal forfeiture requires, as a prerequisite in this instance, a conviction on at least one of the charges in Counts One through Four.

5.    As one of the investigative agents for this case, I have helped supervise this investigation and am thoroughly familiar with the information contained in this affidavit, either through personal investigation or through discussions with other officers who have conducted witness interviews or who have themselves obtained information, which they in turn have reported to me. I have also reviewed available documents relevant to this investigation. Where I have included descriptions of conversations that have occurred, those conversations are described in substance and in part.

## OVERVIEW OF THE CASE

6.    Since in or about the early 1970s, MONZER AL KASSAR has been an international weapons trafficker. During this time period, AL KASSAR led a criminal organization of more than three people that illegally provided weapons and military equipment to

3

armed factions engaged in violent conflicts around the world,
including in Nicaragua, Brazil, Cyprus, Bosnia, Croatia, Somalia,
Iran, and Iraq, among other countries.  Some of these factions
included known terrorist organizations, such as the Palestinian
Liberation Front ("PLF"), the goals of which included attacks on
U.S. interests and U.S. nationals.

7.    To carry out his weapons-trafficking business, AL
KASSAR developed his international organization to include
criminal associates, front companies, and bank accounts in, among
other countries, the United Kingdom, Spain, Lebanon, Syria, Iraq,
Poland, Bulgaria, and Romania.  Additionally, AL KASSAR engaged
in money-laundering transactions throughout the world to disguise
the illicit nature of his criminal proceeds.

8.    As described in further detail below, between February
2006 and June 2007, AL KASSAR, along with his co-defendants AL
GHAZI and MORENO, agreed to sell millions of dollars worth of
weapons -- including machine guns, rocket-propelled grenade
launchers, and surface-to-air missile systems -- to the Fuerzas
Armadas Revolucionarias de Colombia (the "FARC"), a U.S.-
designated and E.U.-designated foreign terrorist organization
based in Colombia, South America.  During a series of telephone
calls, e-mails, and in-person meetings, AL KASSAR, AL GHAZI, and
MORENO agreed to sell the weapons to confidential sources working

4

with the DEA (the "CSs"), who successfully infiltrated AL

KASSAR's criminal organization by representing themselves as

working for the FARC.[1]  As part of their ongoing criminal

activity, AL KASSAR and his co-defendants agreed to sell weapons

to the CSs, with the specific understanding that the weapons were

to be used by the FARC to attack U.S. interests and kill U.S.

nationals and military officers in Colombia.

    9.    During the course of the conspiracy, AL KASSAR engaged

in a number of specific acts in furtherance of the weapons deal

that demonstrated both his willingness and his capacity to

procure the dangerous weapons for the FARC terrorist

organization.  For example, AL KASSAR provided the CSs with,

among other things, (1) a photograph of the vessel to be used to

transport the weapons from Romania and Bulgaria to Suriname,

South America; (2) written specifications for the surface-to-air

missiles he agreed to sell; and (3) information on three bank

accounts held in fictitious names that AL KASSAR controlled in

---

   [1]  Each of the CSs identified herein will be available to
testify at the trial in the United States.  As a result, each of
the CSs will be fully identified before trial, and will be
subject to cross-examination by the defendants' attorneys.  In
addition, during trial, the United States will offer substantial
evidence to corroborate the testimony of the CSs.  Specifically,
the United States will offer evidence of a number of legally-
recorded telephone conversations and meetings between the CSs, AL
KASSAR, and his co-defendants, some of which are described below,
as well as extensive documentary evidence confirming AL KASSAR's
involvement in the terrorism crimes charged in this case.

Spain and Lebanon and into which payment for the weapons was to be made. AL KASSAR ultimately received more than $400,000 for the weapons deal, in funds represented by the CSs to be FARC drug proceeds, but which in fact came from DEA undercover bank accounts in Denmark and New York, New York.

10. During trial in this matter, the United States will prove that AL KASSAR personally agreed to provide the FARC with ton-quantities of C4 explosives in Colombia, as well as expert trainers from Lebanon to teach the FARC how to use effectively the C4 explosives against U.S. interests and U.S. nationals in Colombia. The United States also will prove that AL KASSAR introduced the CSs to the two men whom AL KASSAR had tasked to transport the weapons to the FARC on their cargo vessel. These two men were associates of AL KASSAR and his criminal organization, and AL KASSAR admitted in a recorded meeting with the CSs that he had worked with the two men for decades. In addition, AL KASSAR had repeated contact with his long-established arms suppliers in Bulgaria and Romania, and he traveled to both countries to finalize arrangements to procure the weapons for the FARC.

11. The evidence against AL KASSAR includes, among other things, the following: (1) the testimony of five witnesses regarding AL KASSAR's leadership of a criminal organization

6

involved in international weapons trafficking for the past 30 years; (2) legally-recorded telephone calls, e-mails, and in-person meetings between AL KASSAR, AL GHAZI, MORENO, and the CSs during which AL KASSAR and his co-defendants agreed to provide millions of dollars of weapons to the FARC to be used against U.S. interests and to kill U.S. nationals in Colombia; (3) the testimony of the CSs about the role of AL KASSAR in the FARC weapons deal; (4) documents provided by AL KASSAR to the CSs in connection with the FARC weapons deal, including, a schematic of the vessel to be used to transport the weapons and specifications for the surface-to-air missile systems to be sold to the FARC; and (5) information on bank accounts held in fictitious names in Spain and Lebanon that AL KASSAR controlled and used to receive alleged FARC drug proceeds as payment for the weapons. All of this evidence was gathered following U.S. rules of evidence and procedure, was duly authorized where required, and will be available at the trial of this matter in the United States.

## THE EVIDENCE AGAINST AL KASSAR

### Al Kassar's Criminal History As A Weapons Trafficker

12.    Since the 1970s, the DEA has been investigating AL KASSAR for a variety of crimes, including but not limited to terrorism, illegal weapons sales, narcotics trafficking, and money laundering.  A review of the information the DEA has

7

gathered about AL KASSAR's extensive criminal activities prior to
the commencement of the instant investigation is contained in the
June 28, 2007, Affidavit of Leslie C. Brown (the "Leslie C. Brown
Affidavit"), which was submitted in support of AL KASSAR's
extradition to the United States, and is attached as Exhibit A to
the Affidavit of Boyd M. Johnson III, dated July 17, 2007 (the
"Johnson Affidavit").

    13.  As detailed in the Leslie C. Brown Affidavit, based in
part on the credible testimony of at least five witnesses, as
well as corroborative documents and other evidence, the DEA has
established that over the past 30 years AL KASSAR has led an
international arms-trafficking organization and (i) engaged in
hundreds of illegal arms sales; (ii) had close contacts with Abu
Abbas, the former leader of the PLF, a U.S.-designated terrorist
organization; (iii) sold weapons manufactured in Poland and
diverted them to Yemen where they were distributed to the PLF and
other organizations that stated an intent to use those weapons to
attack U.S. and Israeli interests; (iv) sold weapons that were
procured with documentation that was legitimate on its face but
which did not accurately reflect the ultimate end-users of those
weapons; (v) used codes, such as "air conditioners" to indicate
"TNT," to conceal his illegal weapons business; (vi) sold
military equipment to the Iraqi insurgency in the months leading

up to the military action against Iraq in 2003 by a coalition of troops from the United States, Spain, and other countries; (vii) laundered more than $1 billion on behalf of Saddam Hussein, Iraq's former dictator; (viii) provided weapons and false passports to members and associates of the PLF; (ix) sold weapons to violent groups in Somalia; (x) ordered the killing of a member of the PLF whom AL KASSAR believed was interfering with his affairs; and (xi) admitted to previously selling weapons to people whom AL KASSAR himself described as "bad people."

### The FARC Weapons Transaction

14.    Based on the extensive historical evidence the DEA developed against AL KASSAR over the last 30 years, in the Fall of 2003, other DEA agents and I began the instant investigation of AL KASSAR in an effort to prevent AL KASSAR and his arms-trafficking organization from continuing their criminal activity. To carry out the investigation, other DEA agents and I (i) used the CSs to infiltrate AL KASSAR's criminal organization; (ii) legally-recorded telephone calls and in-person meetings between the CSs, AL KASSAR, and his co-conspirators; (iii) secured documents AL KASSAR himself provided to the CSs in connection with the illegal weapons deal; and (iv) obtained U.S.-court authorization for search warrants to obtain electronic

communications of AL KASSAR and his co-conspirators over e-mail accounts.

15.    The CSs are referred to herein as W-5, CS-1, and CS-2.[2] The CSs are cooperating with the DEA in exchange for financial compensation.    The CSs have proved to be reliable, and other DEA agents and I have been able to corroborate the information we have obtained from the CSs through independent investigation, including through telephone calls, e-mails, and in-person meetings with AL KASSAR and his co-conspirators described below.

**A.    W-5's Initial Negotiations With AL GHAZI**

16.    In an effort to infiltrate AL KASSAR's international weapons-trafficking organization, the DEA directed W-5 to meet with AL GHAZI in Lebanon in May 2005.    W-5 was able to meet AL GHAZI because W-5 claimed an interest in the PLF, the terrorist organization of which AL GHAZI previously was a member.

17.    Approximately one month after their initial meeting, W-5 and AL GHAZI had lunch in Lebanon and discussed AL GHAZI's interest in the PLF.    During this meeting, AL GHAZI admitted to being a former member of the PLF and to maintaining continuing

---

[2]    W-5, CS-1, and CS-2 are the same individuals who are identified as "W-5," "CS-1," and "CS-2" in the Leslie C. Brown Affidavit and in the Third Superseding Indictment.    CS-1 and CS-2 also are the same individuals who are identified as "CS-1" and "CS-2" in the Superseding Indictment.

10

contacts with the terrorist group.  AL GHAZI also admitted to W-5
to participating in weapons transactions.

18.  AL GHAZI and W-5 met again in August 2005 in Lebanon.
During the meeting, AL GHAZI told W-5 that AL KASSAR and his
criminal organization recently had shipped arms to Somalia.  AL
GHAZI indicated that AL KASSAR had asked AL GHAZI to participate
in the transaction but later chose to work with an individual
other than AL GHAZI.

19.  During their August 2005 meeting, AL GHAZI told W-5 of
problems AL KASSAR and his criminal organization faced from
competition from AL KASSAR's brother, who also was in the arms-
trafficking business.  Specifically, AL GHAZI stated that AL
KASSAR's brother sold weapons to violent factions around the
world and was undercutting AL KASSAR's prices to a degree that
made it difficult for AL KASSAR to make a profit.  At the end of
this meeting, W-5 told AL GHAZI that he had a job for AL GHAZI
which he would discuss with AL GHAZI in the future.

20.  Approximately one week later, W-5 and AL GHAZI met to
discuss the job to which W-5 had previously referred.  W-5 told
AL GHAZI that he had an associate who had been informed by  one
of AL GHAZI's and AL KASSAR's weapons customers in Yemen about
weapons deals in which they had participated.  W-5 said that his
associate wanted AL KASSAR and AL GHAZI to obtain weapons for

11

him.  AL GHAZI told W-5 that most of his contacts in Yemen came from AL KASSAR's connections, and that, as a result, AL KASSAR likely would want to be involved in any deal with W-5's associate.  AL GHAZI also expressed concern, however, that AL KASSAR might try to avoid paying any commission to W-5 and AL GHAZI for the deal.  AL GHAZI told W-5 that if AL KASSAR were to participate in such a transaction, he would, as was typical, want an end-user certificate to give to the weapons manufacturer to attempt to conceal the illegal nature of the deal.[3]

21.  On or about November 14, 2006, W-5 and AL GHAZI met in Lebanon to discuss the weapons transaction.  During this meeting, W-5 gave AL GHAZI a copy of an end-user certificate ("First Nicaraguan Certificate") for weapons he claimed his associate wanted to purchase through AL GHAZI and AL KASSAR.[4]  Upon looking at the First Nicaraguan Certificate, which contained the list of weapons W-5's associate reportedly wanted to buy, AL GHAZI

---

[3] An end-user certificate is a document, usually generated by a sovereign nation, that lists the weapons to be sold and states the end-use, or purpose, for those weapons.  Manufacturers of weapons rely on end-user certificates to protect themselves against subsequent claims that the weapons were improperly used to commit criminal acts.

[4] DEA agents procured two actual end-user certificates from their law enforcement counterparts within the Nicaraguan Government which the CSs ultimately provided to AL KASSAR in connection with the FARC weapons transaction.

12

responded that it was a small order.  W-5 told AL GHAZI that if this weapons deal was successful, the transaction could be the beginning of a long-term relationship between W-5's associate and AL KASSAR.  AL GHAZI then agreed to set up a meeting for W-5 with AL KASSAR.

**B.    The December 28, 2006, Meeting With AL KASSAR And AL GHAZI In Lebanon**

22.    On December 28, 2006, W-5 met with AL GHAZI and AL KASSAR in Lebanon.  During the meeting, AL KASSAR, AL GHAZI, and W-5 discussed the First Nicaraguan Certificate that W-5 had previously provided to AL GHAZI.  W-5 confirmed that his "associates" (a reference to CS-1 and CS-2) were interested in purchasing the weapons listed on the First Nicaraguan Certificate and wanted to meet with AL KASSAR at a later date.  AL KASSAR expressed interest in providing the weapons for W-5's associates, but indicated that he was not willing to travel to any other country to meet with W-5's associates about the deal because the deal was for a relatively small amount of weapons.

23.    AL KASSAR requested that W-5 arrange a meeting with AL KASSAR, AL GHAZI, W-5, and W-5's associates at AL KASSAR's residence in Marbella, Spain, so they could work out the specifics of the weapons transaction.  W-5 agreed to arrange the meeting AL KASSAR had requested.

C.   **The February 6-7, 2007, Meetings In Marbella, Spain**

24.   On or about February 6 and 7, 2007, based on AL KASSAR's previous request, W-5, CS-1, and CS-2 met with AL KASSAR, AL GHAZI, and MORENO at AL KASSAR's residence in Marbella, Spain.   During the meetings, W-5 introduced CS-1 and CS-2 to AL KASSAR, AL GHAZI, and MORENO as members of the FARC who were interested in purchasing weapons through AL KASSAR and his criminal organization in order to fight the United States. CS-1 also told AL KASSAR that although the First Nicaraguan Certificate indicated that the weapons were to be delivered in Nicaragua, the FARC in fact wanted AL KASSAR to deliver the weapons to Suriname, South America.

25.   During the meetings, AL KASSAR agreed to sell weapons to the FARC, but told CS-1 that the weapons listed on the First Nicaraguan Certificate constituted a small order for AL KASSAR. CS-1 informed AL KASSAR that he had with him a list with more weapons the FARC wanted to purchase from AL KASSAR, and CS-1 provided the list to AL KASSAR.   The First Nicaraguan Certificate and the list of weapons together included the following items the FARC wanted to purchase from AL KASSAR:   (1) 4,350 AKM assault rifles;  (2) 3,350 AKMS assault rifles;  (3) 200 RPK assault rifles;  (4) 50 Dragunov sniper rifles;  (5) 500 Makarov pistols; (6) 2,000,000 rounds of 7.62mm x 39mm ammunition;  (7) 120 RPG

14

grenade launchers; (8) 1,650 PG-7V grenade rounds; and (9) 2,400

RGO-78 hand grenades.  After receiving the additional list of

weapons from CS-1, AL KASSAR commented:  "This is better, now

we're serious."

26.  CS-1 told AL KASSAR that the FARC would have to pay for

the weapons in cash.  CS-1 explained to AL KASSAR that the FARC

sent drugs to Europe and routinely had substantial amounts of

drug proceeds in several European countries that had to be

returned to the FARC in Colombia.  CS-1 said that the FARC would

have to use the drug proceeds to pay AL KASSAR for the weapons.

27.  AL KASSAR and CS-1 discussed the precise port in

Suriname where CS-1 wanted the weapons to be initially delivered.

AL KASSAR told CS-1 that he had a boat captain ("CC-1") who had

been working with AL KASSAR and his organization for over 30

years, and that CC-1 had never been detained or arrested on

charges of arms trafficking.  AL KASSAR said that CC-1 could take

the weapons right into the port, even if the United States was

watching, and not be detected.

28.  In the presence of W-5, CS-1 and CS-2, AL KASSAR then

used a telephone to call CC-1.  AL KASSAR asked CC-1 in English

about the port in Suriname, and then told CC-1 that he wanted CC-

1 to personally make the trip.

29. Later in the day, and again while meeting with W-5, CS-1 and CS-2, AL KASSAR called another individual, whom he referred to as his "black friend" ("CC-2"). AL KASSAR told CC-2 that he had a list of "goods," a coded reference for the weapons, that he wanted him to check. AL KASSAR told CC-2 to contact multiple companies to get prices for the weapons requested by CS-1.

30. After this call, AL KASSAR left the living room to fax the First Nicaraguan Certificate, as well as the additional list of weapons he had received from CS-1, to CC-2. AL KASSAR returned, and told the CSs that he would put together a price for the weapons they had ordered.

31. Later that evening, AL KASSAR told CS-1 that the weapons deal would cost roughly €6 million to €8 million. AL KASSAR asked CS-1 if they could handle that price, and CS-1 told AL KASSAR not to worry. AL KASSAR told CS-1 and CS-2 that he would not place the order until a substantial payment was made. AL KASSAR also agreed to accept payment for the weapons in cash.

32. During his conversations with CS-1 and CS-2, AL KASSAR offered to send 1,000 of AL KASSAR's men to fight with CS-1, CS-2, and the FARC against the United States in Colombia. AL KASSAR told CS-1 that they were fighting for the same cause, and offered to supply experts to train the FARC to use high-powered

16

explosives, as well as to supply the FARC with quantities of C4 explosives.

33.  Approximately one week after the meetings described above, on February 13, 2007, DEA gave another original Nicaraguan end-user certificate (the "Second Nicaraguan Certificate") to CS-1 for the weapons transaction.  The Second Nicaraguan Certificate contained the same list of weapons as the First Nicaraguan Certificate, but was valid for a longer period of time.  On February 13, 2007, CS-1 sent the Second Nicaraguan Certificate to AL KASSAR in Spain via DHL courier.

**D.   The February 25, 2007, Fax To AL KASSAR And The March 2, 2007, Call With AL KASSAR**

34.  On February 25, 2007, CS-1, who was in the United States, had a fax sent from Guatemala to AL KASSAR at the fax number provided during the February 7, 2007, meeting in connection with the weapons deal.  In the fax, CS-1 asked AL KASSAR whether the Dragonov rifles AL KASSAR was selling were manufactured in Russia.  CS-1 also asked AL KASSAR about the price AL KASSAR would charge CS-1 for the C4 explosives.

35.  On March 2, 2007, CS-1, who was in the United States, spoke with AL KASSAR to discuss the February 25, 2007, fax

17

described above.[5]  During the call, AL KASSAR confirmed that the

Dragonov rifles he planned to sell to the FARC were manufactured

in Russia.  He also confirmed his agreement to sell C4 explosives

to the FARC.  Near the end of the call, AL KASSAR expressed his

reluctance to speak openly over the telephone about the details

of his illegal weapons deal with CS-1 and the FARC.

### E.    The March 6, 2007, Call With AL GHAZI

36.  On March 6, 2007, W-5, who was in the United States,

spoke over the telephone with AL GHAZI concerning the weapons

transaction.  During that call, W-5 and AL GHAZI talked about the

need for AL KASSAR to get quantities of C4 explosives for CS-1,

CS-2, and the FARC.  They also discussed the amount of time that

it was taking to complete the deal, and issues relating to the

commissions both men hoped to obtain from AL KASSAR as part of

the deal.

### F.    The March 26-29, 2007, Meetings In Marbella, Spain

37.  On March 26-29, 2007, W-5, CS-1, and CS-2 met with AL

KASSAR, AL GHAZI, and MORENO at AL KASSAR's residence in

Marbella, Spain, to discuss the weapons deal.  On March 26, 2007,

AL KASSAR met with W-5 before CS-1 and CS-2 arrived.  AL KASSAR

---

[5] During the course of the weapons deal, AL KASSAR used a
number of cellular telephones to speak with CS-1, including
cellular telephones assigned telephone numbers with country codes
for the United Kingdom and Syria.

18

told W-5 that he did not want to meet with CS-1 and CS-2 if they were just coming to talk. AL KASSAR was suspicious that CS-1 and CS-2 would not bring any money, but would only take AL KASSAR's bank account numbers. AL KASSAR asked W-5 how much money CS-1 and CS-2 were bringing with them. W-5 said that he did not know, but assured AL KASSAR that he would be satisfied on the following day.

38. During the meetings with CS-1 and CS-2, AL KASSAR initially asked CS-1 why he had spoken about the C4 explosives over the telephone -- referring to the March 2, 2007, conversation -- and told CS-1 that it was unsafe to do so. AL KASSAR told CS-1 that he would give CS-1 a new telephone number to use to contact AL KASSAR.

39. CS-1 and CS-2 explained to AL KASSAR that President Bush was supporting President Uribe in Colombia, and, as a result, that United States interests in Colombia had to be attacked by the FARC. CS-2 told AL KASSAR that the FARC wanted to turn Colombia into another Iraq. CS-1 and CS-2 told AL KASSAR that the United States was extraditing FARC leaders from Colombia to face charges in the United States, as well as hindering the FARC's cocaine-trafficking activities, and that the FARC accordingly had to go on the attack. CS-1 explained that the

FARC used the cocaine business to finance its terrorist

operations.

40.  AL KASSAR asked CS-1 what remaining questions he had

about the weapons transaction.  CS-1 asked for the prices and

quantities of the C4 explosives.  AL KASSAR responded that he

could get ton-quantities of C4, but that the explosives could not

be transported with the guns.  When CS-2 asked if AL KASSAR could

provide experts to train FARC members in the use of the C4

explosives, AL KASSAR responded that he could but that if the C4

explosives were intended to be used to cause damage against

United States interests in Colombia, his trainers could train the

FARC to make explosive devices in Colombia with less expensive

materials.

41.  CS-1 and AL KASSAR also discussed AL KASSAR selling CS-

1 and the FARC surface-to-air missile systems.  AL KASSAR and CS-

1 spoke about various types of surface-to-air missile systems --

including SAM-7s, SAM-16s, and SAM-18s -- and the systems'

respective abilities to destroy U.S. helicopters.  AL KASSAR

agreed to provide CS-1 with prices for the surface-to-air missile

systems that CS-1 had requested.

42.  AL KASSAR pressed CS-1 for information about the money

that would be needed to finance the weapons deal for the FARC.

In response, CS-1 asked AL KASSAR for a bank account number so

that CS-1 could wire €100,000 to AL KASSAR as an initial payment towards the transaction.  AL KASSAR indicated that the €100,000 could serve as a down payment to secure the transportation services of the boat captain (CC-1) for the weapons, but that AL KASSAR would expect more substantial payments shortly.

43.  AL KASSAR then provided CS-1 with information for a bank account he controlled to receive the €100,000.  CS-1 later contacted DEA agents who wire-transferred €100,000 in DEA undercover funds to AL KASSAR's bank account.

44.  During the meetings, AL KASSAR provided CS-1 and CS-2 with a document that contained specifications on the boat CC-1 would use to transport the weapons to the FARC.  AL KASSAR also gave CS-1 and CS-2 a specification sheet for a surface-to-air missile system he could acquire for the FARC.  Finally, AL KASSAR provided CS-1 and CS-2 with a piece of paper that contained details on another bank account AL KASSAR controlled where CS-1 and CS-2 could send additional monies to pay for the weapons deal.

45.  In order to continue with the weapons transaction, AL KASSAR instructed CS-1 and CS-2 to send additional quantities of money -- in €300,000 to €500,000 increments -- to the bank accounts AL KASSAR had provided.  AL KASSAR emphasized that for

21

the weapons deal to be completed, CS-1 and CS-2 needed to provide

AL KASSAR with additional money in a timely fashion.

46.   After the meetings with CS-1 and CS-2, on March 29,

2007, W-5 met alone with AL KASSAR and AL GHAZI about the weapons

transaction.   During the meeting, AL KASSAR told W-5 and AL GHAZI

that he thought the deal would definitely happen because CS-1

sent him the €100,000, and CS-1 would not have provided the money

had CS-1 not intended to go through with the transaction.   AL

KASSAR also stated that he knew that the money CS-1 and CS-2 were

going to provide was drug money.   AL KASSAR told W-5 and AL GHAZI

that the new relationship with CS-1 and CS-2, and the FARC

organization they represented, could ultimately generate €90

million in weapons sales for them.

G.   The April 18, 2007, Call With AL KASSAR

47.   On April 18, 2007, CS-1 spoke with AL KASSAR over the

telephone regarding the weapons transaction.   During the call, AL

KASSAR and CS-1 discussed the need for AL KASSAR, CS-1, CS-1's

representative, and CC-1 to meet soon in Spain to discuss the

logistics of transporting the weapons to the FARC, a meeting that

AL KASSAR had previously indicated was necessary to move forward

with the weapons deal.

## H.    The May 2, 2007, Meeting Near Malaga, Spain

48.    On May 2, 2007, CS-1 and CS-1's "representative," who in actuality was another DEA confidential source ("CS-3") met with AL KASSAR, MORENO, the boat captain (CC-1), and the owner of the boat ("CC-3"), to discuss transporting the weapons from Romania to the FARC in South America.  In advance of the May 2nd meeting, on April 30, 2007, the DEA wired $135,000 in funds to AL KASSAR, from an account in New York, New York, to the Spain Account, as a payment to CC-1 and CC-3 for their transportation services.  CS-1 had previously represented to AL KASSAR that these funds were FARC drug proceeds.  During the May 2nd meeting, AL KASSAR learned that the $135,000 had been wired from the United States to provide payment to CC-1 and CC-3.  AL KASSAR then verbally provided CS-1 and CS-3 with another account in Spain to receive additional U.S. dollars for the weapons deal.

49.    During the meeting, AL KASSAR introduced CC-1 and CC-3 to CS-1 and CS-3 as "Kristos" and "George," respectively.  AL KASSAR told CS-1 and CS-3 that "Kristos" and "George" were his trusted associates of 25 years who would transport the weapons from Romania and Bulgaria to Suriname.  AL KASSAR, MORENO, CS-1, CS-3, "Kristos," and "George" discussed the fact that although the end-user certificate said the weapons were going to Nicaragua, they were actually going to Suriname.  They discussed

23

the boat they would use to transport the weapons, and "Kristos"
and "George" showed CS-1 and CS-3 a photograph of that vessel.
"Kristos" and "George" told CS-1 and CS-3 that the vessel was
docked in Greece awaiting receipt of the weapons shipment.  AL
KASSAR told CS-1 and CS-3 that everything had been arranged to
transport the weapons to the FARC in Suriname.

    50.  On May 2, 2007, after the meetings with CS-1 and CS-3,
an associate of CC-1 and CC-3 in Greece sent an e-mail to AL
KASSAR and MORENO.[6]  In the e-mail, the associate provided bank
account information for money to be wire-transferred to CC-1 and
CC-3 in connection with the weapons deal.  In addition, the e-
mail contained attachments of maps of various maritime routes
from Romania to Central and South America and back to Syria.

I.    **The May 9-12, 2007, Telephone Calls With AL KASSAR**

    51.  On May 7, 2007, DEA wired $50,000 to AL KASSAR from
DEA's New York, New York, undercover account into one of the bank
accounts AL KASSAR had provided to CS-1 as an additional payment
on the weapons deal.  The money was credited to AL KASSAR's bank
account on May 9, 2007.

_____

    [6]  During the course of this investigation, the DEA obtained
U.S.  court-authorized search warrants for e-mails over an e-mail
account used by AL KASSAR, MORENO, and their co-conspirators to
coordinate the weapons deal.  A number of these e-mails are
discussed above.

52. On May 9, 2007, AL KASSAR spoke with CS-1, who was in the United States, over the telephone. During the call, AL KASSAR told CS-1 that he was in Bulgaria and traveling the following day to Romania in connection with the weapons deal. AL KASSAR told CS-1 that he would meet with the weapons manufacturers in Romania on May 11th.

53. During this call, AL KASSAR also confirmed that he had received the $50,000 from CS-1 in the Second Spain Account. AL KASSAR informed CS-1 that he soon schedule a date with CC-1 and CC-3 to transport the weapons. AL KASSAR also told CS-1 that the FARC was not moving forward with the weapons transaction quickly enough, and that the group would soon have to make a significant payment so that AL KASSAR could take care of the weapons contract in Romania.

54. On May 9, 2007, DEA wire transferred an additional $115,000 from the New York, New York, undercover account to one of AL KASSAR's bank accounts. The money was credited to AL KASSAR's account on May 10, 2007.

55. On May 10, 2007, MORENO spoke over the telephone to CS-1, who was in the United States. MORENO confirmed to CS-1 that he and AL KASSAR were in Romania in connection with the weapons deal. I have confirmed through airline records that AL KASSAR in fact entered Romania on May 10, 2007.

25

56. On or about May 10, 2007, CS-1, who was in the United States, spoke with AL KASSAR over the telephone. During the call, CS-1 told AL KASSAR that there would be a brief delay in providing further payment for the weapons. Specifically, CS-1 indicated to AL KASSAR that CS-1 and his associates had experienced a problem with the bank accounts they had been using to wire transfer money to AL KASSAR, and that CS-1 was preparing to travel to meet AL KASSAR in person and provide him with a substantial payment. AL KASSAR continued to complain about the delays, and told CS-1 that it was really important for CS-1 to make the trip himself.

57. Later, on May 10, 2007, AL KASSAR spoke again with CS-1 over the telephone. During the call, CS-1 informed AL KASSAR that CS-1 and his people were having difficulty procuring another end-user certificate to list the additional weapons, including the surface-to-air missile systems, that the FARC had ordered from AL KASSAR. AL KASSAR told the CS-1 not to worry, telling him that AL KASSAR could obtain a proper end-user certificate for CS-1 at a cost of 15 to 20 percent of the total cost of the weapons listed on the certificate. AL KASSAR confirmed that he had received the additional transfer of money in his bank account, but continued to complain about how slowly the money was

arriving and to pressure CS-1 to provide the balance of the money owed for the weapons as soon as possible.

**J.    The May 14, 2007, E-mail From CC-3 To AL KASSAR and MORENO**

58.    On May 14, 2007, AL KASSAR and MORENO received an e-mail from CC-1 and CC-3's shipping company regarding the transportation of the weapons.  In the e-mail, an associate of CC-1 and CC-3 attached a shipping contract to be signed in connection with the weapons deal.  This document confirmed that the M/V Anastasia -- a boat that had previously been used in 2001 to transport more than 600 metric tons of weapons to Angola -- would be used by CC-1 and CC-3 to transport the weapons, that Nicaragua was listed as the destination for the weapons, and that some of the weapons had been procured by AL KASSAR from Romarms, a weapons manufacturer in Bucharest, Romania.

**K.    The May 20 And 22, 2007, Telephone Calls**

59.    On May 20, 2007, CS-1, who was in the United States, spoke with MORENO over the telephone.  During the call, MORENO told CS-1 that AL KASSAR had traveled to Romania to give the weapons manufacturer an explanation for why the payment for the weapons from CS-1 was delayed.  CS-1 informed MORENO that the FARC had €3.5 million that CS-1 could deliver to AL KASSAR in

27

Romania to pay for the weapons.  MORENO indicated that he would

discuss the matter with AL KASSAR.

60.  On May 22, 2007, CS-1, who was in Panama, spoke again

with MORENO over the telephone.  During the call, CS-1 asked

MORENO if AL KASSAR could meet CS-1 in Romania so that CS-1 could

arrange to transfer the Euros to AL KASSAR to pay for the

weapons.  MORENO indicated that he had spoken with AL KASSAR

about the issue, but that CS-1 should speak with AL KASSAR

directly about the matter.

61.  Approximately one hour later, on May 22, 2007, CS-1,

who was in Panama, spoke with AL KASSAR over the telephone.

During the call, CS-1 told AL KASSAR that he was in Panama.  AL

KASSAR indicated that he was in Romania, and that the weapons

manufacturer was upset because AL KASSAR had promised them that

they would have CS-1's money for the deal.  CS-1 told AL KASSAR

that the FARC had €3.5 million Euros in Romania to provide to the

weapons manufacturer.  AL KASSAR indicated that the Romanian arms

manufacturer would not be willing to receive the cash, so

something else had to be arranged.  AL KASSAR told CS-1 that he

had people in Romania who could receive the money.  CS-1

indicated that he would be in Romania on either June 5th or 6th,

and could arrange to transfer the money to AL KASSAR at that

time.  CS-1 also told AL KASSAR that the FARC had approximately €2 million in Greece that could be used for the weapons deal.

62.  AL KASSAR told CS-1 that because of the delay in payment, AL KASSAR himself had paid some of his own money to the weapons manufacturer.  AL KASSAR told CS-1 that he could pay AL KASSAR back, and AL KASSAR emphasized that he did not want to hurt his reputation with the weapons manufacturer.  AL KASSAR told CS-1 to call him as soon as CS-1 had control of the money in Romania so they could arrange the transfer.

**L.   The May 25, 2007, E-mail From CC-1 To AL KASSAR And MORENO**

63.  On May 25, 2007, CC-1, the boat captain who AL KASSAR identified as "Kristos" during the May 2, 2007, meeting with CS-1, sent an e-mail to AL KASSAR and MORENO regarding the weapons deal.  In the e-mail, CC-1 asked MORENO to tell AL KASSAR that there was a problem with the boat CC-1 and CC-3 were going to use to transport the weapons.  Specifically, CC-1 informed MORENO and AL KASSAR that their boat, the M/V Anastasia, was on the Arab blacklist, and therefore might not be available to transport the weapons to the FARC.  CC-1 asked AL KASSAR to speak with an attorney in Syria to try to correct the problem so that CC-1 and CC-3 could have the boat available to transport the weapons for AL KASSAR.

**M.   The Arrest Of AL KASSAR And His Co-Defendants**

64.   On May 28, 2007, CS-1, who was in the United States,
spoke over the telephone with AL KASSAR.   During the call, CS-1
confirmed with AL KASSAR that he would be in Bucharest, Romania,
on Wednesday, June 6, 2007, to meet with AL KASSAR and provide
him with the €3.5 million payment.   AL KASSAR told CS-1 to call
him once CS-1 arrived in Romania, confirm that CS-1 had the money
in his possession, and then AL KASSAR would arrange to meet with
CS-1.

65.   On June 6, 2007, AL GHAZI and MORENO traveled to
Romania in connection with the weapons deal.   AL GHAZI met with
CS-1 and CS-2 at a hotel in Bucharest to discuss whether AL
KASSAR intended to travel to Romania and accept the transfer of
the €3.5 million.   AL GHAZI spoke over the telephone with AL
KASSAR about his travel plans, and AL KASSAR first told AL GHAZI
that he would not travel anywhere until payment was made by CS-1,
and later stated that he would travel only if CS-1 first showed
the money to AL GHAZI.

66.   Also on June 6, 2007, MORENO met with CS-2 to discuss
AL KASSAR's travel and the €3.5 million payment.   MORENO also
spoke over the telephone with AL KASSAR, and MORENO said that it
was unlikely that AL KASSAR would travel to Romania to receive
payment but that there was a possibility that AL KASSAR might

30

travel to Greece to receive payment there.  According to MORENO,
AL KASSAR said that he would not travel anywhere unless CS-1
first made payment, or at least showed to MORENO the money that
would constitute the payment.

67.  On June 6, 2007, CS-1, who was in Romania, spoke over
the telephone to AL KASSAR.  During the call, CS-1 explained to
AL KASSAR that AL KASSAR's refusal to travel to Romania had
angered CS-1's boss, who CS-1 had previously described as a
leader of the FARC, who had made the trip to Romania with CS-1 in
order to meet AL KASSAR before the €3.5 million payment was made
for the weapons.  In order to receive the payment, AL KASSAR
agreed to travel from Marbella to Madrid, Spain, on June 7, 2007,
to meet in person with CS-1 and CS-1's boss.

68.  On June 7, 2007, AL KASSAR traveled from Marbella to
Madrid, Spain, by airplane.  Law enforcement officers in Spain,
acting on a provisional arrest request from the United States,
arrested AL KASSAR after he arrived in Madrid.  Shortly
thereafter, law enforcement officers in Romania, also acting on
provisional arrest requests from the United States, arrested AL
GHAZI and MORENO in Bucharest, Romania.

**CONCLUSION**

69.  At the trial of this matter, the United States will be
able to present the following evidence to establish that AL

31

KASSAR is guilty of the crimes charged in the Third Superseding Indictment:  (1) the testimony of five witnesses regarding AL KASSAR's criminal history as an international weapons trafficker; (2) legally-recorded telephone calls, e-mails, and in-person meetings between AL KASSAR, AL GHAZI, MORENO, and the CSs during which AL KASSAR and his co-defendants agreed to provide millions of dollars of weapons to the FARC in Colombia; (3) the testimony of the CSs about the role of AL KASSAR in the FARC weapons deal; (4) documents provided by AL KASSAR to the CSs in connection with the FARC weapons deal, including, a schematic of the vessel to be used to transport the weapons and specifications for the surface-to-air missile systems to be sold to the FARC; and (5) information on bank accounts held in fictitious names in Spain and Lebanon that AL KASSAR controlled and used to receive alleged FARC drug proceeds as payment for the weapons.  The CSs have identified the person depicted in the photograph attached as Exhibit 1 to this affidavit as the MONZER AL KASSAR who participated in the terrorism crimes in this case.

70.  This affidavit is sworn to before the Honorable Jed S. Rakoff, the United States District Judge assigned to this case

who is a person duly empowered to administer an oath for this

purpose.

_____
SPECIAL AGENT WILLIAM BROWN
DRUG ENFORCEMENT ADMINISTRATION

SWORN AND SUBSCRIBED BEFORE
ME THIS 17th DAY OF JULY 2007

_____
HONORABLE JED S. RAKOFF
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

33