# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - x

| | |
|---|---|
| UNITED STATES OF AMERICA : | **AFFIDAVIT IN SUPPORT OF** |
| | **REQUEST FOR EXTRADITION** |
|     -v.- : | |
| | S3 07 Cr. 354 (JSR) |
| MONZER AL KASSAR, : | |
|     a/k/a "Al Munawar," | |
|     a/k/a "El Taous," : | |
| TAREQ MOUSA AL GHAZI, and | |
| LUIS FELIPE MORENO GODOY, : | |
| | |
|        Defendants. : | |

- - - - - - - - - - - - - - x

    I, WILLIAM BROWN, being duly sworn, hereby depose and state:

### INTRODUCTION

    1.   I am a citizen of the United States.

    2.   I am a Special Agent with the United States Drug Enforcement Administration ("DEA"). The DEA conducts investigations involving crimes against the United States, including narcotics trafficking, terrorism, and money laundering offenses. Based on my training and experience, I have become knowledgeable about criminal activity, particularly violations of the federal narcotics, terrorism, and money laundering statutes.

    3.   My duties as a DEA Special Agent include the investigation of MONZER AL KASSAR ("AL KASSAR"), TAREQ MOUSA AL GHAZI ("AL GHAZI"), and LUIS FELIPE MORENO GODOY ("MORENO") in the case of United States v. Monzer Al Kassar, Tareq Mousa Al Ghazi, and Luis Felipe Moreno Godoy. As one of the investigative

agents for this case, I am familiar with the facts of the

investigation involving the criminal activities of these three

defendants.

4.    AL GHAZI, MORENO, and AL KASSAR are charged in a five-

count Superseding Indictment, dated June 21, 2007 (the "Third

Superseding Indictment").   Count One charges AL GHAZI, MORENO,

and AL KASSAR with conspiracy to murder United States nationals,

in violation of Title 18, United States Code, Section 2332(b).

Count Two charges AL GHAZI, MORENO, and AL KASSAR with conspiracy

to kill United States officers and employees, in violation of

Title 18, United States Code, Sections 1114 and 1117.   Count

Three charges AL GHAZI, MORENO, and AL KASSAR with conspiracy to

acquire and use a missile system designed to destroy aircraft, in

violation of Title 18, United States Code, Section 2332g.   Count

Four charges AL GHAZI, MORENO, and AL KASSAR with conspiracy to

provide material support or resources to a designated foreign

terrorist organization, in violation of Title 18, United States

Code, Section 2339B.   Count Five charges MORENO and AL KASSAR

with conspiracy to commit money laundering crimes, in violation

of Title 18, United States Code, Section 1956(a)(3).   AL GHAZI,

MORENO, and AL KASSAR are also charged in the Third Superseding

Indictment with criminal forfeiture pursuant to Title 18, United

States Code, Section 981(a)(1)(G).   The forfeiture allegation

2

against AL GHAZI and MORENO seeks forfeiture of, among other assets, funds in bank accounts in Spain and Lebanon that AL GHAZI, MORENO, and AL KASSAR used to facilitate the terrorism crimes charged in the Third Superseding Indictment. Criminal forfeiture requires, as a prerequisite in this instance, a conviction on at least one of the charges in Counts One through Four.

5.    As one of the investigative agents for this case, I have helped supervise this investigation and am thoroughly familiar with the information contained in this affidavit, either through personal investigation or through discussions with other officers who have conducted witness interviews or who have themselves obtained information, which they in turn have reported to me. I have also reviewed available documents relevant to this investigation. Where I have included descriptions of conversations that have occurred, those conversations are described in substance and in part.

### OVERVIEW OF THE CASE

6.    Since in or about the early 1970s, MONZER AL KASSAR has been an international weapons trafficker. During this time period, AL KASSAR led a criminal organization of more than three people that illegally provided weapons and military equipment to armed factions engaged in violent conflicts around the world,

3

including in Nicaragua, Brazil, Cyprus, Bosnia, Croatia, Somalia, Iran, and Iraq, among other countries. Some of these factions included known terrorist organizations, such as the Palestinian Liberation Front ("PLF"), the goals of which included attacks on U.S. interests and U.S. nationals. Accordingly, the evidence, as set forth below, demonstrates that AL KASSAR's international organization was an "organized criminal group" as defined by the United Nations Convention against Transnational Organized Crime.

7.    To carry out his weapons-trafficking business, AL KASSAR developed his international organization to include criminal associates, front companies, and bank accounts in, among other countries, the United Kingdom, Spain, Lebanon, Syria, Iraq, Poland, Bulgaria, and Romania. Additionally, AL KASSAR engaged in money-laundering transactions throughout the world to disguise the illicit nature of his criminal proceeds.

8.    TAREQ MOUSA AL GHAZI, a Syrian national who resided in Lebanon, has worked with AL KASSAR in his weapon-trafficking business for approximately the last 30 years. During this time period, AL GHAZI's role has included brokering weapons transactions for AL KASSAR and advising others on the logistics of purchasing weapons through AL KASSAR. A photograph of AL GHAZI is attached as Exhibit 1 to the Affidavit of Brendan R. McGuire, dated July 24, 2007 (the "McGuire Affidavit").

4

9.    LUIS FELIPE MORENO GODOY, a Chilean national who resided with AL KASSAR in Spain, has worked with AL KASSAR in his weapons-trafficking business for approximately the last 10 years. During this time period, MORENO's role has included managing financial matters for AL KASSAR, including arranging for various bank accounts to be used to conduct weapons transactions.  A photograph of MORENO is attached as Exhibit 3 to the McGuire Affidavit.

10.    As described in further detail below, between February 2006 and June 2007, AL GHAZI, MORENO, and AL KASSAR agreed to sell millions of dollars worth of weapons -- including machine guns, rocket-propelled grenade launchers, and surface-to-air missile systems -- to the Fuerzas Armadas Revolucionarias de Colombia (the "FARC"), a U.S.-designated and E.U.-designated foreign terrorist organization based in Colombia, South America. During a series of telephone calls, e-mails, and in-person meetings, AL GHAZI, MORENO, and AL KASSAR, agreed to sell the weapons to confidential sources working with the DEA (the "CSs"), who successfully infiltrated AL KASSAR's criminal organization by representing themselves as working for the FARC.[1]  As part of

_____

[1]    Each of the CSs identified herein will be available to testify at the trial in the United States.  As a result, each of the CSs will be fully identified before trial, and will be subject to cross-examination by the defendants' attorneys.  In

5

their ongoing criminal activity, AL GHAZI, MORENO, and AL KASSAR agreed to sell weapons to the CSs, with the specific understanding that the weapons were to be used by the FARC to attack U.S. interests and kill U.S. nationals and military officers in Colombia.

11.     During the course of the conspiracy, AL GHAZI, MORENO and AL KASSAR engaged in a number of specific acts in furtherance of the weapons deal that demonstrated both their willingness and their capacity to procure the dangerous weapons for the FARC terrorist organization.  For example, after several meetings with one of the CSs over the course of more than a year, AL GHAZI introduced one of the CSs to AL KASSAR at a meeting in Lebanon in December 2006.  AL GHAZI offered to arrange the meeting after the CS indicated that he had associates who were interested in purchasing weapons from AL GHAZI and AL KASSAR.  After meeting the two other CSs who claimed to be representatives of the FARC, AL GHAZI, MORENO, and AL KASSAR provided the CSs with (1) a photograph of the vessel to be used to transport the weapons from

---

addition, during trial, the United States will offer substantial evidence to corroborate the testimony of the CSs.  Specifically, the United States will offer evidence of a number of legally-recorded telephone conversations and meetings between the CSs, AL GHAZI, MORENO, and AL KASSAR, some of which are described below, as well as extensive documentary evidence confirming AL GHAZI, MORENO, and AL KASSAR's involvement in the terrorism crimes charged in this case.

Romania and Bulgaria to Suriname, South America, (2) written specifications for the surface-to-air missiles the defendants agreed to sell, and (3) information on three bank accounts held in fictitious names that the defendants controlled in Spain and Lebanon and into which payment for the weapons was to be made. The defendants ultimately received more than $400,000 for the weapons deal, in funds represented by the CSs to be FARC drug proceeds, but which in fact came from DEA undercover bank accounts in Denmark and New York, New York.   In addition, on May 2, 2007, MORENO and AL KASSAR introduced the CSs to the two men who would transport the weapons on their cargo vessel -- criminal associates with whom AL KASSAR admitted he and his organization had worked for 25 years.   Thereafter, during the week of May 7, 2007, MORENO and AL KASSAR personally traveled to Bulgaria and Romania to finalize arrangements to procure the weapons. Finally, on June 6, 2007, AL GHAZI and MORENO personally traveled to Romania to meet with the CSs.   On June 6, 2007, they both met with the CSs in Bucharest in an effort to collect an additional payment for the weapons.

      12.   The evidence against AL GHAZI and MORENO includes, among other things, the following:   (1) the testimony of five witnesses regarding the roles of AL GHAZI and MORENO in AL KASSAR's international weapons trafficking organization over the

past 30 years; (2) legally-recorded telephone calls, e-mails, and in-person meetings between AL GHAZI, MORENO, AL KASSAR and the CSs during which the defendants agreed to provide millions of dollars of weapons to the FARC to be used against U.S. interests and to kill U.S. nationals in Colombia; (3) the testimony of the CSs about the roles of AL GHAZI and MORENO in the FARC weapons deal; (4) documents provided by the defendants to the CSs in connection with the FARC weapons deal, including, a schematic of the vessel to be used to transport the weapons and specifications for the surface-to-air missile systems to be sold to the FARC; and (5) information on bank accounts held in fictitious names in Spain and Lebanon that the defendants controlled and used to receive alleged FARC drug proceeds as payment for the weapons. All of this evidence was gathered following U.S. rules of evidence and procedure, was duly authorized where required, and will be available at the trial of this matter in the United States.

## THE EVIDENCE AGAINST AL GHAZI AND MORENO

### Al Ghazi and Al Kassar's History As Weapons Traffickers

13.    Prior to the investigation, the DEA had learned from multiple sources that AL GHAZI and AL KASSAR had participated in a significant number of unlawful weapons transactions prior to the instant case.  Among those sources was a witness ("W-1") who,

in or about the early 1990's, provided information regarding some of AL GHAZI and AL KASSAR's prior criminal history.  W-1, whose information has been corroborated by other evidence and deemed reliable, advised that he met AL GHAZI in the early 1980's in Poland.  According to W-1, Poland then was used as a safe haven by arms traffickers.  AL GHAZI introduced W-1 to AL KASSAR and Abu Abbas, then the leader of the Palestine Liberation Front ("PLF"), another U.S.-designated foreign terrorist organization.

14.  From in or about 1982 up to and including in or about 1986, W-1 assisted AL GHAZI and AL KASSAR, among others, to facilitate more than one hundred weapons transactions.  W-1 advised that those weapons were manufactured and smuggled from Poland, Hungary and the former Czechoslovakia to Yemen. According to W-1, those weapons, once in Yemen, were distributed to the PLF and other organizations that had stated an intent to use them to target United States and Israeli interests.  Through W-1 the DEA learned that many of these weapons initially were procured with documentation that was legitimate on its face but which did not reflect the ultimate user of those weapons.  In other words, the documentation involved in AL GHAZI and AL KASSAR's prior weapons transactions with W-1 did not provide that the weapons would be diverted to terrorist organizations and other criminal enterprises.

9

15.    In addition, W-1 stated that in or about 1992, AL GHAZI lived in a particular apartment in Poland at which W-1 often saw AL GHAZI and AL KASSAR.  According to W-1, AL GHAZI and AL KASSAR used this apartment as a safe house to store documents related to their many weapons transactions, and sometimes weapons themselves.

16.    At that time, W-1 and another witness ("W-2"), whose information also has been corroborated by the DEA and deemed reliable, took a number of the documents from AL GHAZI'S apartment in Poland and gave them to law enforcement officials. Those documents confirmed AL GHAZI and AL KASSAR's history as arms dealers and connected them to Abu Abbas and the PLF.[2]  Among those documents were receipts for the sale of a large quantity of weapons to Yemen.  These receipts reflected AL GHAZI and AL KASSAR's involvement in both the weapons transaction and their agreement to divert a percentage of those weapons to the PLF. Specifically, the documents included a list of the weapons AL GHAZI and AL KASSAR had agreed to provide to the PLF and a code

---

[2]Abu Abbas was the general director of the PLF and the mastermind of the hijacking of the vessel *Achille Lauro*.  During proceedings related to AL KASSAR's trial in Spain on charges stemming from the hijacking of the *Achille Lauro*, AL KASSAR admitted in a sworn statement to his relationship with Abu Abbas and the PLF.  The DEA also has obtained numerous photographs of AL KASSAR with Abu Abbas and other prominent members of the PLF.

10

used to describe those weapons.  For example, the code list defined a "hand grenade" as a "ring;" a "SCUD missile" as "sanitary equipment;" and "TNT" as "air conditioners."  Among the weapons AL GHAZI and AL KASSAR agreed to provide as part of that particular transaction were "1,000 fragmentation rockets for MIROL launchers;" "10,000 anti-armored vehicle grenades with propulsion ignition devices;" and "two tons of high performance C-4 hydrogen plastic explosives."[3]

17.  In addition to the information about AL GHAZI and AL KASSAR's prior arms dealing provided by W-1 and W-2, the DEA had also received historical information from a third witness.  The witness ("W-3") who first made contact with AL KASSAR as part of the instant investigation also gave the DEA, prior to any contact with AL KASSAR, historical information regarding AL GHAZI and AL

---

[3]These documents were admitted into evidence at AL KASSAR's trial in Spain related to the *Achille Lauro* hijacking.  While the Spanish court did not question the authenticity of the documents, it noted that there were questions regarding the manner in which these documents were obtained.  AL GHAZI has since boasted to a witness (who is identified later in this affidavit as W-3) about his success in convincing the Spanish authorities that these documents were taken from his apartment without his consent in his effort to undermine the authenticity of those documents and to "save AL KASSAR."  Implicit in this statement by AL GHAZI is that AL GHAZI, indeed, admitted to W-3 that the documents were AL KASSAR's.

KASSAR and their criminal activities.[4]   W-3's historical
information provided further evidence of AL GHAZI and AL KASSAR's
past experience in illegal weapons trafficking as well as their
willingness to participate in the unlawful weapons transaction at
the center of the present case.

18.   Specifically, W-3 advised that he first met AL GHAZI in
Lebanon in May of 2005.   W-3 was able to gain an introduction to
AL GHAZI because he (W-3) claimed an interest in the PLF, the
terrorist organization of which AL GHAZI previously was a member.
Approximately one month after their initial meeting, W-3 and AL
GHAZI had lunch in Lebanon and discussed AL GHAZI's interest in
the PLF.   During this meeting, AL GHAZI admitted to being a
former member of the PLF and to maintaining positive contacts
with the terrorist group.   According to W-3, AL GHAZI helped
arrange for Abu Abbas to travel to Poland from Yugoslavia after
his (Abbas') participation in the *Achille Lauro* hijacking.

19.   During this June 2005 meeting, AL GHAZI also told W-3
that he and an associate had prepared to assassinate Egyptian
President Anwar Sadat during a visit President Sadat made to the
Ivory Coast.   AL GHAZI also admitted to W-3 to participating in
weapons transactions.

---

[4]W-3 is not one of the confidential sources referenced in the
Indictment.

20.   AL GHAZI and W-3 met again in August 2005.   AL GHAZI told W-3 that AL KASSAR recently had shipped arms to Somalia.[5] According to what AL GHAZI told W-3, AL KASSAR had asked him (AL GHAZI) to participate in the transaction but later chose to work with another individual.   AL GHAZI further told W-3 that AL KASSAR registered the boat used to transport the weapons to Somalia in AL GHAZI's name.[6]

21.   During these August 2005 meetings, AL GHAZI also told W-3 of problems AL KASSAR faced from competition from his (AL KASSAR's) brother.   Specifically, AL GHAZI stated that AL KASSAR's brother also sold weapons to violent factions around the world and was undercutting AL KASSAR's price to a degree that made it difficult for AL KASSAR to make a profit.

22.   In addition, AL GHAZI told W-3 that AL KASSAR had ordered the murder, which later was attempted by a PLF member Gawad Ghazoul without success, of a former associate, Elias Awad. According to AL GHAZI, AL KASSAR ordered Awad to be killed because AL KASSAR believed that Awad was interfering with his

---

[5]A 2001 Resolution issued by the General Assembly of the United Nations concluded that AL KASSAR violated arms embargoes to Somalia (and Croatia) in 1992.

[6]It was during this meeting when AL GHAZI admitted to W-3 that the documents related to a weapons transaction and found in the safe house in Poland were AL KASSAR's and his.

relationship with Yasir Arafat, the former and now-deceased
leader of the Palestine Liberation Organization ("PLO"), and
believed Awad was cooperating with Israeli intelligence.[7]

23.  The above-described historical information regarding AL
GHAZI, AL KASSAR and MORENO's arms dealing and their assistance
to a designated foreign terrorist organization plainly
demonstrates their willingness and capability to engage in such
criminal activity in the future.  However, their willingness and
capability were not demonstrated solely through historical
information, but indeed through their own conduct during the time
period and in furtherance of the conspiracies charged in the
Superseding Indictment.

### The FARC Weapons Transaction

24.  Based on the extensive historical evidence the DEA
developed against AL GHAZI, AL KASSAR, and MORENO over the last
30 years, in the Fall of 2003, other DEA agents and I began the
instant investigation in an effort to prevent AL KASSAR, AL
GHAZI, MORENO, and any other members of AL KASSAR's arms-
trafficking organization from continuing their criminal activity.

---

[7]In a sworn statement made in Court around the time of his
arrest on charges related to this incident, Gawad Ghazoul
admitted that he attempted to murder Awad on the orders of AL
KASSAR.  Another co-conspirator, Ahmed Boumershed, further
admitted that it was AL KASSAR who provided the weapons used in
the attempted murder.

To carry out the investigation, other DEA agents and I:  (i) used the CSs to infiltrate AL KASSAR's criminal organization; (ii) legally-recorded telephone calls and in-person meetings between the CSs, AL KASSAR, AL GHAZI, and MORENO; (iii) secured documents the defendants provided to the CSs in connection with the illegal weapons deal; and (iv) obtained U.S.-court authorization for search warrants to obtain electronic communications of the co-conspirators over an e-mail account provided by MORENO to one of the CSs.

25.  The CSs are referred to herein as W-3, CS-1[8], and CS-2[9].  The CSs are each cooperating with the DEA in exchange for financial compensation.  The CSs have proved to be reliable, and other DEA agents and I have been able to corroborate the information we have obtained from the CSs through independent investigation.  The CSs have each indicated their willingness to testify if necessary in this matter.

A.    W-3's Initial Negotiations With AL GHAZI

26.  In an effort to infiltrate AL KASSAR's international weapons-trafficking organization, the DEA directed W-3 to meet

---

[8]CS-1 is the same individual who is referred to as "CS-1" in the Third Superseding Indictment.

[9]CS-2 is the same individual who is referred to as "CS-2" in the Third Superseding Indictment.

15

with AL GHAZI in Lebanon in May 2005.  W-3 was able to meet AL

GHAZI because W-3 claimed an interest in the PLF, the terrorist

organization of which AL GHAZI previously was a member.

27.  Approximately one month after their initial meeting, W-

3 and AL GHAZI had lunch in Lebanon and discussed AL GHAZI's

interest in the PLF.  During this meeting, AL GHAZI admitted to

being a former member of the PLF and to maintaining continuing

contacts with the terrorist group.  AL GHAZI also admitted to W-3

to participating in weapons transactions.

28.  AL GHAZI and W-3 met again in August 2005 in Lebanon.

During the meeting, AL GHAZI told W-3 that AL KASSAR recently had

shipped arms to Somalia.  According to what AL GHAZI told W-3, AL

KASSAR had asked AL GHAZI to participate in the transaction but

later chose to work with an individual other than AL GHAZI.

29.  During their August 2005 meeting, AL GHAZI told W-3 of

problems AL KASSAR and his criminal organization faced from

competition from AL KASSAR's brother, who also was in the arms-

trafficking business.  Specifically, AL GHAZI stated that AL

KASSAR's brother sold weapons to violent factions around the

world and was undercutting AL KASSAR's prices to a degree that

made it difficult for AL KASSAR to make a profit.  At the end of

this meeting, W-3 told AL GHAZI that he had a job for AL GHAZI

which he would discuss with AL GHAZI in the future.

30.  Approximately one week later, W-3 and AL GHAZI met to discuss the job to which W-3 had previously referred.  W-3 told AL GHAZI that he had an associate who had been informed by one of AL GHAZI's and AL KASSAR's weapons customers in Yemen about weapons deals in which they had participated.  W-3 said that his associate wanted AL KASSAR and AL GHAZI to obtain weapons for him.  AL GHAZI told W-3 that most of his contacts in Yemen came from AL KASSAR's connections, and that, as a result, AL KASSAR likely would want to be involved in any deal with W-3's associate.  AL GHAZI also expressed concern, however, that AL KASSAR might try to avoid paying any commission to W-3 and AL GHAZI for the deal.  AL GHAZI told W-3 that if AL KASSAR were to participate in such a transaction, he would, as was typical, want an end-user certificate to give to the weapons manufacturer to attempt to conceal the illegal nature of the deal.[10]

31.  On or about November 14, 2006, W-3 and AL GHAZI met in Lebanon to discuss the weapons transaction.  During this meeting, W-3 gave AL GHAZI a copy of an end-user certificate ("First Nicaraguan Certificate") for weapons he claimed his associate

---

[10] An end-user certificate is a document, usually generated by a sovereign nation, that lists the weapons to be sold and states the end-use, or purpose, for those weapons.  Manufacturers of weapons rely on end-user certificates to protect themselves against subsequent claims that the weapons were improperly used to commit criminal acts.

17

wanted to purchase through AL GHAZI and AL KASSAR.[11]  Upon

looking at the First Nicaraguan Certificate, which contained the

list of weapons W-3's associate reportedly wanted to buy, AL

GHAZI responded that it was a small order.  W-3 told AL GHAZI

that if this weapons deal was successful, the transaction could

be the beginning of a long-term relationship between W-3's

associate and AL KASSAR.  AL GHAZI then agreed to set up a

meeting for W-3 with AL KASSAR.

   B.   **The December 28, 2006, Meeting With AL GHAZI and AL KASSAR In Lebanon**

   32.   On December 28, 2006, W-3 met with AL GHAZI and AL

KASSAR in Lebanon.  During the meeting, AL KASSAR, AL GHAZI, and

W-3 discussed the First Nicaraguan Certificate that W-3 had

previously provided to AL GHAZI.  W-3 confirmed that his

"associates" (a reference to CS-1 and CS-2) were interested in

purchasing the weapons listed on the First Nicaraguan Certificate

and wanted to meet with AL KASSAR at a later date.  AL KASSAR

expressed interest in providing the weapons for W-3's associates,

but indicated that he was not willing to travel to any other

--------------------------------------------

   [11]  DEA agents procured two actual end-user certificates from
their law enforcement counterparts within the Nicaraguan
Government which the CSs ultimately provided to AL KASSAR, AL
GHAZI, and MORENO in connection with the FARC weapons
transaction.

country to meet with W-3's associates about the deal because the deal was for a relatively small amount of weapons.

33.    AL KASSAR requested that W-3 arrange a meeting with AL KASSAR, AL GHAZI, W-3, and W-3's associates at AL KASSAR's residence in Marbella, Spain, so they could work out the specifics of the weapons transaction.    W-3 agreed to arrange the meeting AL KASSAR had requested.

C.    The February 6-7, 2007, Meetings In Marbella, Spain

34.    On or about February 6 and 7, 2007, based on AL KASSAR's previous request, W-3, CS-1, and CS-2 met with AL KASSAR, AL GHAZI, and MORENO at AL KASSAR's residence in Marbella, Spain.    During the meetings, W-3 introduced CS-1 and CS-2 to AL KASSAR and AL GHAZI as members of the FARC who were interested in purchasing weapons through AL KASSAR and his criminal organization in order to fight the United States.    CS-1 also told AL KASSAR that although the First Nicaraguan Certificate indicated that the weapons were to be delivered in Nicaragua, the FARC in fact wanted AL KASSAR to deliver the weapons to Suriname, South America.

35.    During the meetings, in the presence of AL GHAZI, AL KASSAR agreed to sell weapons to the FARC, but told CS-1 that the weapons listed on the First Nicaraguan Certificate constituted a small order for AL KASSAR.    CS-1 informed AL KASSAR that he had

19

with him a list with more weapons the FARC wanted to purchase
from AL KASSAR, and CS-1 provided the list to AL KASSAR.  The
First Nicaraguan Certificate and the list of weapons together
included the following items the FARC wanted to purchase from AL
KASSAR:  (1) 4,350 AKM assault rifles;  (2) 3,350 AKMS assault
rifles;  (3) 200 RPK assault rifles;  (4) 50 Dragunov sniper
rifles;  (5) 500 Makarov pistols;  (6) 2,000,000 rounds of 7.62mm x
39mm ammunition;  (7) 120 RPG grenade launchers;  (8) 1,650 PG-7V
grenade rounds;  and (9) 2,400 RGO-78 hand grenades.  After
receiving the additional list of weapons from CS-1, AL KASSAR
commented:  "This is better, now we're serious."

36.  CS-1 told AL KASSAR and AL GHAZI that the FARC would
have to pay for the weapons in cash.  CS-1 explained to AL KASSAR
and AL GHAZI that the FARC sent drugs to Europe and routinely had
substantial amounts of drug proceeds in several European
countries that had to be returned to the FARC in Colombia.  CS-1
said that the FARC would have to use the drug proceeds to pay AL
KASSAR for the weapons.

37.  AL KASSAR and CS-1 discussed the precise port in
Suriname where CS-1 wanted the weapons to be initially delivered.
AL KASSAR told CS-1 that he had a boat captain ("CC-1")[12] who had

---

[12] The abbreviation "CC" is used for the word co-conspirator.

been working with AL KASSAR and his organization for over 30

years, and that CC-1 had never been detained or arrested on

charges of arms trafficking.  AL KASSAR said that CC-1 could take

the weapons right into the port, even if the United States was

watching, and not be detected.

38.  In the presence of W-3, CS-1, CS-2, and AL GHAZI, AL

KASSAR then used a telephone to call CC-1.  AL KASSAR asked CC-1

in English about the port in Suriname, and then told CC-1 that he

wanted CC-1 to personally make the trip.

39.  Later in the day, and again while meeting with W-3, CS-

1, CS-2, and AL GHAZI, AL KASSAR called another individual, whom

he referred to as his "black friend" ("CC-2").  AL KASSAR told

CC-2 that he had a list of "goods," a coded reference for the

weapons, that he wanted him to check.  AL KASSAR told CC-2 to

contact multiple companies to get prices for the weapons

requested by CS-1.

40.  After this call, AL KASSAR left the living room to fax

the First Nicaraguan Certificate, as well as the additional list

of weapons he had received from CS-1, to CC-2.  AL KASSAR

returned, and told the CSs that he would put together a price for

the weapons they had ordered.

41.  Later that evening, AL KASSAR told CS-1, in the

presence of AL GHAZI, that the weapons deal would cost roughly €6

21

million to €8 million.  AL KASSAR asked CS-1 if they could handle that price, and CS-1 told AL KASSAR not to worry.  AL KASSAR told CS-1 and CS-2 that he would not place the order until a substantial payment was made.  AL KASSAR also agreed to accept payment for the weapons in cash.

42.  During his conversations with CS-1 and CS-2, for which AL GHAZI was present, AL KASSAR offered to send 1,000 of AL KASSAR's men to fight with CS-1, CS-2, and the FARC against the United States in Colombia.  AL KASSAR told CS-1 that they were fighting for the same cause, and offered to supply experts to train the FARC to use high-powered explosives, as well as to supply the FARC with quantities of C4 explosives.

43.  Approximately one week after the meetings described above, on February 13, 2007, DEA gave another original Nicaraguan end-user certificate (the "Second Nicaraguan Certificate") to CS-1 for the weapons transaction.  The Second Nicaraguan Certificate contained the same list of weapons as the First Nicaraguan Certificate, but was valid for a longer period of time.  On February 13, 2007, CS-1 sent the Second Nicaraguan Certificate to AL KASSAR in Spain via DHL courier.

D.  **The February 25, 2007, Fax To AL KASSAR And The March 2, 2007, Call With AL KASSAR**

22

44.    On February 25, 2007, CS-1, who was in the United States, had a fax sent from Guatemala to AL KASSAR at the fax number provided during the February 7, 2007, meeting in connection with the weapons deal.  In the fax, CS-1 asked AL KASSAR whether the Dragonov rifles AL KASSAR was selling were manufactured in Russia.  CS-1 also asked AL KASSAR about the price AL KASSAR would charge CS-1 for the C4 explosives.

45.    On March 2, 2007, CS-1, who was in the United States, spoke with AL KASSAR to discuss the February 25, 2007, fax described above.[13]  During the call, AL KASSAR confirmed that the Dragonov rifles he planned to sell to the FARC were manufactured in Russia.  He also confirmed his agreement to sell C4 explosives to the FARC.  Near the end of the call, AL KASSAR expressed his reluctance to speak openly over the telephone about the details of his illegal weapons deal with CS-1 and the FARC.

E.    The March 6, 2007, Call With AL GHAZI

46.    On March 6, 2007, W-3 spoke over the telephone with AL GHAZI concerning the weapons transaction.  During that call, W-3 and AL GHAZI talked about the need for AL KASSAR to get quantities of C4 explosives for CS-1, CS-2, and the FARC.  They

---

[13] During the course of the weapons deal, AL KASSAR used a number of cellular telephones to speak with CS-1, including cellular telephones assigned telephone numbers with country codes for the United Kingdom and Syria.

23

also discussed the amount of time that it was taking to complete the deal, and issues relating to the commissions both men hoped to obtain from AL KASSAR as part of the deal.

### F.   The March 26-29, 2007, Meetings In Marbella, Spain

47.   On March 26-29, 2007, W-3, CS-1, and CS-2 met with AL KASSAR, AL GHAZI, and MORENO at AL KASSAR's residence in Marbella, Spain, to discuss the weapons deal.  On March 26, 2007, AL KASSAR and AL GHAZI met with W-3 before CS-1 and CS-2 arrived. AL KASSAR told W-3 that he did not want to meet with CS-1 and CS-2 if they were just coming to talk.  AL KASSAR was suspicious that CS-1 and CS-2 would not bring any money, but would only take AL KASSAR's bank account numbers.  AL KASSAR asked W-3 how much money CS-1 and CS-2 were bringing with them.  W-3 said that he did not know, but assured AL KASSAR that he would be satisfied on the following day.

48.   Prior to the meeting with AL KASSAR, AL GHAZI, based upon his prior dealings with AL KASSAR in similar transactions, advised the CSs on how best to negotiate with AL KASSAR for the purchase of weapons.  During the meetings with CS-1 and CS-2, AL KASSAR initially asked CS-1 why he had spoken about the C4 explosives over the telephone -- referring to the March 2, 2007, conversation -- and told CS-1 that it was unsafe to do so.  AL

KASSAR told CS-1 that he would give CS-1 a new telephone number to use to contact AL KASSAR.

49.    During the meetings, in the presence of AL KASSAR and MORENO, the CS-1 and CS-2 paid AL GHAZI €4,000 for his assistance in arranging the weapons transaction with AL KASSAR.  In addition, CS-1 and CS-2 explained to AL KASSAR and AL GHAZI that President Bush was supporting President Uribe in Colombia, and, as a result, that United States interests in Colombia had to be attacked by the FARC.  CS-2 told AL KASSAR and AL GHAZI that the FARC wanted to turn Colombia into another Iraq.  CS-1 and CS-2 told AL KASSAR and AL GHAZI that the United States was extraditing FARC leaders from Colombia to face charges in the United States, as well as hindering the FARC's cocaine-trafficking activities, and that the FARC accordingly had to go on the attack.  CS-1 explained that the FARC used the cocaine business to finance its terrorist operations.

50.    During the meetings, AL KASSAR, MORENO, CS-1, and CS-2 also discussed the need to acquire a cover load of sugar that could be transported on the ship when it made the return trip to Europe after dropping off the weapons to the FARC.  CS-2 also discussed the possibility of placing a load of cocaine in the sugar cover load for the return trip, which would be unloaded before the sugar was delivered.  At first, AL KASSAR did not

understand but MORENO then explained to AL KASSAR what CS-2 meant. MORENO said that made sense because both the sugar and the cocaine were white.

51. At the end of one of the meetings, MORENO drove W-3, CS-1 and CS-2 to the apartments where they were staying. At this time, CS-2 and MORENO continued to talk about transporting the drugs. MORENO stated that AL KASSAR had buyers for the drugs in Syria.

52. Ultimately, AL KASSAR asked CS-1 what remaining questions he had about the weapons transaction. CS-1 asked for the prices and quantities of the C4 explosives. In AL GHAZI and MORENO's presence, AL KASSAR responded that he could get ton-quantities of C4, but that the explosives could not be transported with the guns. When CS-2 asked if AL KASSAR could provide experts to train FARC members in the use of the C4 explosives, AL KASSAR responded that he could but that if the C4 explosives were intended to be used to cause damage against United States interests in Colombia, his trainers could train the FARC to make explosive devices in Colombia with less expensive materials.

53. CS-1 and AL KASSAR also discussed AL KASSAR selling CS-1 and the FARC surface-to-air missile systems. In AL GHAZI and MORENO's presence, AL KASSAR and CS-1 spoke about various types

of surface-to-air missile systems -- including SAM-7s, SAM-16s, and SAM-18s -- and the systems' respective abilities to destroy U.S. helicopters.  AL KASSAR agreed to provide CS-1 with prices for the surface-to-air missile systems that CS-1 had requested.

54.  AL KASSAR pressed CS-1 for information about the money that would be needed to finance the weapons deal for the FARC. In response, CS-1 asked AL KASSAR for a bank account number so that CS-1 could wire €100,000 to AL KASSAR as an initial payment towards the transaction.  AL KASSAR indicated that the €100,000 could serve as a down payment to secure the transportation services of the boat captain (CC-1) for the weapons, but that AL KASSAR would expect more substantial payments shortly.

55.  AL KASSAR then provided CS-1 with information for a bank account he controlled to receive the €100,000.  CS-1 later informed AL KASSAR that he wanted to go to an Internet café in town to wire transfer the €100,000.  MORENO then drove CS-1 and CS-2 to an Internet café, and CS-1 contacted DEA agents who wire-transferred €100,000 in DEA undercover funds to AL KASSAR's bank account.

56.  During the meetings, AL KASSAR provided CS-1 and CS-2 with a document that contained specifications on the boat CC-1 would use to transport the weapons to the FARC.  AL KASSAR also gave CS-1 and CS-2 a specification sheet for a surface-to-air

27

missile system he could acquire for the FARC.  Finally, AL KASSAR

provided CS-1 and CS-2 with a piece of paper that contained

details on another bank account AL KASSAR controlled where CS-1

and CS-2 could send additional monies to pay for the weapons

deal.

57.  In order to continue with the weapons transaction, AL

KASSAR instructed CS-1 and CS-2 to send additional quantities of

money -- in €300,000 to €500,000 increments -- to the bank

accounts AL KASSAR had provided.  AL KASSAR emphasized that for

the weapons deal to be completed, CS-1 and CS-2 needed to provide

AL KASSAR with additional money in a timely fashion.

58.  After the meetings with CS-1 and CS-2, on March 29,

2007, W-3 met alone with AL KASSAR and AL GHAZI about the weapons

transaction.  During the meeting, AL KASSAR told W-3 and AL GHAZI

that he thought the deal would definitely happen because CS-1

sent him the €100,000, and CS-1 would not have provided the money

had CS-1 not intended to go through with the transaction.  AL

KASSAR also stated that he knew that the money CS-1 and CS-2 were

going to provide was drug money.  AL KASSAR told W-3 and AL GHAZI

that the new relationship with CS-1 and CS-2, and the FARC

organization they represented, could ultimately generate €90

million in weapons sales for them.

G.    The April 18, 2007, Call With AL KASSAR

28

59.  On April 18, 2007, CS-1 spoke with AL KASSAR over the telephone regarding the weapons transaction.  During the call, AL KASSAR and CS-1 discussed the need for AL KASSAR, CS-1, CS-1's representative, and CC-1 to meet soon in Spain to discuss the logistics of transporting the weapons to the FARC, a meeting that AL KASSAR had previously indicated was necessary to move forward with the weapons deal.

**H.    The May 2, 2007, Meeting Near Malaga, Spain**

60.  On May 2, 2007, CS-1 and CS-1's "representative," who in actuality was another DEA confidential source ("CS-3") met with AL KASSAR, MORENO, the boat captain (CC-1), and the owner of the boat ("CC-3"), to discuss transporting the weapons from Romania to the FARC in South America.  In advance of the May 2nd meeting, on April 30, 2007, the DEA wired $135,000 in funds to AL KASSAR, from an account in New York, New York, to the Spain Account, as a payment to CC-1 and CC-3 for their transportation services.  CS-1 had previously represented to AL KASSAR that these funds were FARC drug proceeds.  During the May 2nd meeting, AL KASSAR learned that the $135,000 had been wired from the United States to provide payment to CC-1 and CC-3.  AL KASSAR then verbally provided CS-1 and CS-3 with another account in Spain to receive additional U.S. dollars for the weapons deal.

61.  During the meeting, AL KASSAR introduced CC-1 and CC-3 to CS-1 and CS-3 as "Kristos" and "George," respectively.  AL KASSAR told CS-1 and CS-3 that "Kristos" and "George" were his trusted associates of 25 years who would transport the weapons from Romania and Bulgaria to Suriname.  AL KASSAR, MORENO, CS-1, CS-3, "Kristos," and "George" discussed the fact that although the end-user certificate said the weapons were going to Nicaragua, they were actually going to Suriname.  They discussed the boat they would use to transport the weapons, and "Kristos" and "George" showed CS-1 and CS-3 a photograph of that vessel. "Kristos" and "George" told CS-1 and CS-3 that the vessel was docked in Greece awaiting receipt of the weapons shipment.  AL KASSAR told CS-1 and CS-3 that everything had been arranged to transport the weapons to the FARC in Suriname.

62.  On May 2, 2007, after the meetings with CS-1 and CS-3, an associate of CC-1 and CC-3 in Greece sent an e-mail to AL KASSAR and MORENO.[14]  In the e-mail, the associate provided bank account information for money to be wire-transferred to CC-1 and CC-3 in connection with the weapons deal.  In addition, the e-

---

[14]  During the course of this investigation, the DEA obtained U.S. court-authorized search warrants for e-mails over an e-mail account used by AL KASSAR, MORENO, and their co-conspirators to coordinate the weapons deal.  A number of these e-mails are discussed above.

mail contained attachments of maps of various maritime routes from Romania to Central and South America and back to Syria.

I.    **The May 9-12, 2007, Telephone Calls With AL KASSAR and MORENO**

63.    On May 7, 2007, DEA wired $50,000 to AL KASSAR from DEA's New York, New York, undercover account into one of the bank accounts AL KASSAR had provided to CS-1 as an additional payment on the weapons deal.  The money was credited to AL KASSAR's bank account on May 9, 2007.

64.    On May 9, 2007, AL KASSAR spoke with CS-1, who was in the United States, over the telephone.  During the call, AL KASSAR told CS-1 that he was in Bulgaria and traveling the following day to Romania in connection with the weapons deal.  AL KASSAR told CS-1 that he would meet with the weapons manufacturers in Romania on May 11th.

65.    During this call, AL KASSAR also confirmed that he had received the $50,000 from CS-1 in the Second Spain Account. AL KASSAR informed CS-1 that he would soon schedule a date with CC-1 and CC-3 to transport the weapons.  AL KASSAR also told CS-1 that the FARC was not moving forward with the weapons transaction quickly enough, and that the group would soon have to make a significant payment so that AL KASSAR could take care of the weapons contract in Romania.

66. On May 9, 2007, DEA wire transferred an additional $115,000 from the New York, New York, undercover account to one of AL KASSAR's bank accounts. The money was credited to AL KASSAR's account on May 10, 2007.

67. On May 10, 2007, MORENO spoke over the telephone to CS-1, who was in the United States. MORENO confirmed to CS-1 that he and AL KASSAR were in Romania in connection with the weapons deal. I have confirmed through airline records that AL KASSAR and MORENO in fact entered Romania on May 10, 2007.

68. On or about May 10, 2007, CS-1, who was in the United States, spoke with AL KASSAR over the telephone. During the call, CS-1 told AL KASSAR that there would be a brief delay in providing further payment for the weapons. Specifically, CS-1 indicated to AL KASSAR that CS-1 and his associates had experienced a problem with the bank accounts they had been using to wire transfer money to AL KASSAR, and that CS-1 was preparing to travel to meet AL KASSAR in person and provide him with a substantial payment. AL KASSAR continued to complain about the delays, and told CS-1 that it was really important for CS-1 to make the trip himself.

69. Later, on May 10, 2007, AL KASSAR spoke again with CS-1 over the telephone. During the call, CS-1 informed AL KASSAR that CS-1 and his people were having difficulty procuring another

32

end-user certificate to list the additional weapons, including the surface-to-air missile systems, that the FARC had ordered from AL KASSAR. AL KASSAR told the CS-1 not to worry, telling him that AL KASSAR could obtain a proper end-user certificate for CS-1 at a cost of 15 to 20 percent of the total cost of the weapons listed on the certificate. AL KASSAR confirmed that he had received the additional transfer of money in his bank account, but continued to complain about how slowly the money was arriving and to pressure CS-1 to provide the balance of the money owed for the weapons as soon as possible.

J.    **The May 14, 2007, E-mail From CC-3 To AL KASSAR and MORENO**

70.    On May 14, 2007, AL KASSAR and MORENO received an e-mail from CC-1 and CC-3's shipping company regarding the transportation of the weapons. In the e-mail, an associate of CC-1 and CC-3 attached a shipping contract to be signed in connection with the weapons deal. This document confirmed that the M/V Anastasia -- a boat that had previously been used in 2001 to transport more than 600 metric tons of weapons to Angola -- would be used by CC-1 and CC-3 to transport the weapons, that Nicaragua was listed as the destination for the weapons, and that some of the weapons had been procured by AL KASSAR from Romarms, a weapons manufacturer in Bucharest, Romania.

33

**K.    The May 20 and 22, 2007 Telephone Calls**

71.    On May 20, 2007, CS-1, who was in Panama, spoke with MORENO over the telephone.  During the call, MORENO told CS-1 that AL KASSAR had traveled to Romania to give the weapons manufacturer an explanation for why the payment for the weapons from CS-1 was delayed.  CS-1 informed MORENO that the FARC had €3.5 million that CS-1 could deliver to AL KASSAR in Romania to pay for the weapons.  MORENO indicated that he would discuss the matter with AL KASSAR.

72.    On May 22, 2007, CS-1, who was in Panama, spoke again with MORENO over the telephone.  During the call, CS-1 asked MORENO if AL KASSAR could meet CS-1 in Romania so that CS-1 could arrange to transfer the Euros to AL KASSAR to pay for the weapons.  MORENO indicated that he had spoken with AL KASSAR about the issue, but that CS-1 should speak with AL KASSAR directly about the matter.

73.    Approximately one hour later, on May 22, 2007, CS-1, who was in Panama, spoke with AL KASSAR over the telephone.  During the call, CS-1 told AL KASSAR that he was in Panama.  AL KASSAR indicated that he was in Romania, and that the weapons manufacturer was upset because AL KASSAR had promised them that they would have CS-1's money for the deal.  CS-1 told AL KASSAR that the FARC had €3.5 million Euros in Romania to provide to the

weapons manufacturer. AL KASSAR indicated that the Romanian arms manufacturer would not be willing to receive the cash, so something else had to be arranged. AL KASSAR told CS-1 that he had people in Romania who could receive the money. CS-1 indicated that he would be in Romania on either June 5th or 6th, and could arrange to transfer the money to AL KASSAR at that time. CS-1 also told AL KASSAR that the FARC had approximately €2 million in Greece that could be used for the weapons deal.

74.    AL KASSAR told CS-1 that because of the delay in payment, AL KASSAR himself had paid some of his own money to the weapons manufacturer. AL KASSAR told CS-1 that he could pay AL KASSAR back, and AL KASSAR emphasized that he did not want to hurt his reputation with the weapons manufacturer. AL KASSAR told CS-1 to call him as soon as CS-1 had control of the money in Romania so they could arrange the transfer.

L.    **The May 25, 2007, E-mail From CC-1 To AL KASSAR And MORENO**

75.    On May 25, 2007, CC-1, the boat captain who AL KASSAR identified as "Kristos" during the May 2, 2007, meeting with CS-1, sent an e-mail to AL KASSAR and MORENO regarding the weapons deal. In the e-mail, CC-1 asked MORENO to tell AL KASSAR that there was a problem with the boat CC-1 and CC-3 were going to use to transport the weapons. Specifically, CC-1 informed MORENO and

AL KASSAR that their boat, the M/V Anastasia, was on the Arab blacklist, and therefore might not be available to transport the weapons to the FARC. CC-1 asked AL KASSAR to speak with an attorney in Syria to try to correct the problem so that CC-1 and CC-3 could have the boat available to transport the weapons for AL KASSAR.

**M.    The Arrests of AL GHAZI, MORENO, and AL KASSAR**

76. On May 28, 2007, CS-1, who was in the United States, spoke over the telephone with AL KASSAR. During the call, CS-1 confirmed with AL KASSAR that he would be in Bucharest, Romania, on Wednesday, June 6, 2007, to meet with AL KASSAR and provide him with the €3.5 million payment. AL KASSAR told CS-1 to call him once CS-1 arrived in Romania, confirm that CS-1 had the money in his possession, and then AL KASSAR would arrange to meet with CS-1.

77. On June 6, 2007, AL GHAZI and MORENO traveled to Romania in connection with the weapons deal. AL GHAZI met with CS-1 at a hotel in Bucharest to discuss whether AL KASSAR intended to travel to Romania and accept the transfer of the €3.5 million. AL GHAZI spoke over the telephone with AL KASSAR about his travel plans, and AL KASSAR first told AL GHAZI that he would not travel anywhere until payment was made by CS-1, and later

stated that he would travel only if CS-1 first showed the money to AL GHAZI.

78.  Also on June 6, 2007, MORENO met with CS-1 to discuss AL KASSAR's travel and the €3.5 million payment.  MORENO also spoke over the telephone with AL KASSAR, and MORENO said that it was unlikely that AL KASSAR would travel to Romania to receive payment but that there was a possibility that AL KASSAR might travel to Greece to receive payment there.  According to MORENO, AL KASSAR said that he would not travel anywhere unless CS-1 first made payment, or at least showed to MORENO the money that would constitute the payment.

79.  On June 6, 2007, CS-1, who was in Romania, spoke over the telephone to AL KASSAR.  During the call, CS-1 explained to AL KASSAR that AL KASSAR's refusal to travel to Romania had angered CS-1's boss, who CS-1 had previously described as a leader of the FARC, who had made the trip to Romania with CS-1 in order to meet AL KASSAR before the €3.5 million payment was made for the weapons.  In order to receive the payment, AL KASSAR agreed to travel from Marbella to Madrid, Spain, on June 7, 2007, to meet in person with CS-1 and CS-1's boss.

80.  On June 7, 2007, AL KASSAR traveled from Marbella to Madrid, Spain, by airplane.  Law enforcement officers in Spain, acting on a provisional arrest request from the United States,

37

arrested AL KASSAR after he arrived in Madrid.  Shortly
thereafter, law enforcement officers in Romania, also acting on
provisional arrest requests from the United States, arrested AL
GHAZI and MORENO in Bucharest, Romania.

## CONCLUSION

81.    At the trial of this matter, the United States will be
able to present the following evidence to establish that AL GHAZI
and MORENO are guilty of the crimes charged in the Third
Superseding Indictment:  (1) the testimony of five witnesses
regarding the roles of AL GHAZI and MORENO in AL KASSAR's
international weapons trafficking organization over the past 30
years; (2) legally-recorded telephone calls, e-mails, and in-
person meetings between AL KASSAR, AL GHAZI, MORENO, and the CSs
during which the three defendants agreed to provide millions of
dollars of weapons to the FARC in Colombia; (3) the testimony of
the CSs about the roles of AL GHAZI and MORENO in the FARC
weapons deal; (4) documents provided by the defendants to the CSs
in connection with the FARC weapons deal, including, a schematic
of the vessel to be used to transport the weapons and
specifications for the surface-to-air missile systems to be sold
to the FARC; and (5) information on bank accounts held in
fictitious names in Spain and Lebanon that the defendants
controlled and used to receive alleged FARC drug proceeds as

payment for the weapons. The CSs have identified the person depicted in the photograph attached as Exhibit 1 to the McGuire Affidavit as TAREQ MOUSA AL GHAZI, and the person depicted in the photograph attached as Exhibit 3 to the McGuire Affidavit as LUIS FELIPE MORENO GODOY, both of whom participated in the terrorism crimes in this case.

82.  This affidavit is sworn to before the Honorable Jed S. Rakoff, the United States District Judge assigned to this case who is a person duly empowered to administer an oath for this purpose.

_____
SPECIAL AGENT WILLIAM BROWN
DRUG ENFORCEMENT ADMINISTRATION

SWORN AND SUBSCRIBED BEFORE
ME THIS 24th DAY OF JULY 2007

_____
HONORABLE JED S. RAKOFF
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

CERTIFIED AS A TRUE COPY ON

THIS DATE  7-24-07

BY
( ) Clerk
(✔) Deputy