UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- x
UNITED STATES OF AMERICA                 :
                                         :
            -v-                          :        S3 07 CR 354(JSR)
                                         :
MONZER AL KASSAR,                        :        MEMORANDUM
TAREQ MOUSA AL GHAZI, and                :
LUIS FELIPE MORENO GODOY,                :
                                         :
            Defendants.                  :
---------------------------------------- x

JED S. RAKOFF, U.S.D.J.

After the defendants in this case moved to dismiss the Indictment, the Court, by Order dated September 5, 2008, denied defendants' motions in all respects. This Memorandum explains the reasons for that Order.[1]

The five-count Indictment in this case charges that, between February 2006 and May 2007, defendants Monzer Al Kassar, Tareq Mousa Al Ghazi, and Luis Felipe Moreno Godoy conspired to provide Fuerzas Armadas Revolucionarias de Colombia ("FARC"), an international terrorist group, with millions of dollars worth of weapons to be used to kill United States nationals in Colombia. Indictment ¶ 9-10. FARC is designated as a foreign terrorist organization by both the United States and the European Union and is dedicated to the violent

---

[1] Defendants also sought other relief, including (1) disclosure of "predisposition evidence"; (2) removal of surplusage from the Indictment; (3) leave to file "additional appropriate motions"; (4) identification of known accomplices; (5) filing of a bill of particulars; (6) disclosure of confidential informants; (7) production of certain audio and visual recordings pursuant to Fed. R. Crim. P. 16; and (8) permission to join in the motions filed by co-defendants. The Court addressed and resolved these motions at oral argument. See August 5, 2008 transcript.

overthrow of the democratically elected Government of Colombia. Id. ¶ 6. According to the Indictment, FARC is the world's largest supplier of cocaine, and during the last five years has directed violent acts against United States citizens in Colombia in order to protect its financial interests in the cocaine trade. Id. ¶¶ 6-7. The Indictment further charges that defendant Al Kassar has been an international weapons trafficker since the early 1970s and has been a source of weapons and military equipment for armed factions around the world, including known terrorist organizations. Id. ¶ 1. Co-defendants Al Ghazi and Godoy are alleged to have worked with Al Kassar in his weapon-trafficking business for, respectively, about 30 years in Al Ghazi's case and about 10 years in Godoy's case. Id. ¶¶ 4, 5.

The specific crimes here alleged are that the defendants: (1) conspired to kill United States nationals in violation of 18 U.S.C. § 2332(b); (2) conspired to kill officers and employees of the United States in violation of 18 U.S.C. § 1117; (3) conspired to acquire and use anti-aircraft missiles in violation of 18 U.S.C. § 2332(g)(a)(1); (4) conspired to provide material support or resources to a foreign terrorist organization in violation of 18 U.S.C. § 2339B(a)(1); and (5) engaged in money laundering in violation of 18 U.S.C. § 1956(a)(3).

Defendants seek dismissal of the Indictment both in its entirety and with respect to specific counts. As to the entirety, defendants argue first, that the Government was so deeply involved in

the creation of the charged violations, and that its conduct was so "outrageous," that it violated defendants' Fifth Amendment right to due process. Although "in an extreme case, Government involvement in criminal activity might be so outrageous that due process principles would absolutely bar the Government from invoking judicial processes to obtain a conviction, . . . only Government conduct that shocks the conscience can violate due process." <u>United States v. Rahman</u>, 189 F.3d 88, 131 (2d Cir. 1999) (internal citations and quotation marks omitted); <u>see</u> <u>Hampton v. United States</u>, 425 U.S. 484, 495 n.7 (1976) (Powell, J. concurring) ("police over-involvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction").

Defendants readily concede that the burden of establishing outrageous conduct is high, <u>Rahman</u>, 189 at 131, and that, accordingly, such claims rarely succeed. <u>United States v. LaPorta</u>, 46 F.3d 152, 160 (2d Cir. 1994); <u>see</u> Memorandum of Law of Defendant Tareq Mousa Al Ghazi in Support of Motion to Dismiss the Indictment and Other Relief ("Al Ghazi Mem.") at 14. Nevertheless, defendants, in an attempt to meet this high burden, proffer through sworn affidavits that the Government, through confidential informants: (1) first approached defendants and suggested that they become involved in what was originally represented to be an entirely legal arms deal involving other weapons, Affidavit of Monzer Al Kassar sworn to on July 15, 2008 ("Al Kassar Aff.") ¶¶ 4-5; Affidavit of Defendant Tareq Mousa Al Ghazi sworn to on July 10, 2008 ("Al Ghazi Aff.") ¶¶ 3-8;

3

Affidavit of Luis Felipe Moreno Godoy sworn to on June 10, 2008 ("Godoy Aff.") ¶¶ 5-6; (2) executed a "bait and switch" by continuing to misrepresent the nature of the arms deal until after defendants had agreed to the deal, Al Kassar Aff. ¶ 9; Al Ghazi Aff. ¶ 13; (3) only then approached defendant Al Kassar about buying surface-to-air missiles after piquing his interest in an arms deal for other weapons, see Indictment ¶¶ 11(a), (d), (s), (ee); and (4) even then, produced the end-user certificate that was critical to the deal's success, Al Kassar Aff. ¶ 5, Al Ghazi Aff. ¶¶ 8-10;

This does not begin to meet the standards of Rahman. Conscience-shocking conduct typically involves either the use of coercion, force, or some other "violation of the defendant's person." United States v. Schmidt, 105 F.3d 82, 91 (2d Cir. 1997); see Rahman, 189 F.3d at 131 ("paradigm examples of conscience-shocking conduct are egregious invasions of individuals rights"). Here, defendants were not forced or coerced into agreeing to participate in the charged weapons transaction, no threats were made, no violence was used, and there is no indication that defendants agreed to participate in the transaction unwillingly.[2] The Government hardly can be said to have "created" the charged offenses, where, as here, the defendants are alleged to have taken active steps towards

---

[2] Indeed, defendants' allegation that the Government engaged in shocking and outrageous conduct is belied by their own sworn affidavits, which indicate, for instance, that Al Ghazi "reluctantly" introduced Al Kassar to a Government informant because the informant "demanded" that he do so, "and for no other reason," Al Ghazi Aff. ¶ 11, and that Al Kassar's and Godoy's interactions with various informants were nothing but voluntary. See Al Kassar Aff. ¶¶ 4-6, Godoy Aff. ¶¶ 5-6.

4

procuring and selling millions of dollars worth of illegal weapons, including surface-to-air missiles, Al Ghazi Aff. ¶ 11, providing specifications of surface-to-air missiles, Indictment ¶¶ 11(aa), organizing the logistics of transporting the missiles, Id. ¶¶ 11(cc), (hh), (rr), requesting "a significant payment" for the missiles, Id. ¶ 11(qq), offering to obtain an improper end-user certificate for the missiles, Id. ¶ 11(ss), and traveling to Romania in connection with the deal, Id. ¶¶ 11(ccc)-(fff).

At most, the defendants' allegations merely indicate that the Government created "an opportunity for the commission of crime by those willing to do so," United States v. Myers, 692 F.2d 823, 837 (2d Cir. 1982), investigatory conduct that is neither novel nor nefarious. See Rahman, 189 F.3d at 131 ("[u]ndercover work, in which a Government agent pretends to be engaged in criminal activity, is often necessary to detect criminal conspiracies. If such work is to succeed, the undercover agent must have 'something of value to offer' the conspirators")(citation omitted). Here, the defendants' own allegations show, at most, that the Government, after gaining the defendants' confidence, invited the defendants to engage in unlawful conduct, an invitation the defendants accepted and zealously furthered. This does not remotely constitute the kind of "outrageous" conduct that implicates due process concerns.[3]

---

[3] Defendants also contend that the Government's "outrageous" conduct violated the "MLAT treaty," Treaty with Spain on Mutual Legal Assistance in Criminal Matters, U.S.-Sp., Nov. 20, 1990, Treaty Doc. 102-21, and "recognized rules of comity and fairness." Al Ghazi Mem. at 11. If the Court were to reach these arguments, it would find them entirely without merit; but

5

Defendants next argue that the Government improperly "manufactured" federal jurisdiction by misrepresenting (at least initially) the nature of the arms transaction, thus "transform[ing] a lawful weapons transaction into a global conspiracy to kill Americans in Colombia." Al Ghazi Mem. at 19. The concept of "manufactured federal jurisdiction," however, is "properly understood not as an independent defense, but as a subset of three possible defense theories: (i) the defendant was entrapped into committing a federal crime, since he was not predisposed to commit the crime in the way necessary for the crime to qualify as a federal offense; (ii) the defendant's due process rights were violated because the government's actions in inducing the defendant to commit the federal crime were outrageous; or (iii) an element of the federal statute has not been proved, so federal courts have no jurisdiction over the crime." United States v. Wallace, 85 F.3d 1063, 1065-1066 (2d Cir. 1996) (internal citations omitted).

As to the first defense, while one or more defendants may seek to raise entrapment as a jury issue at trial, no entrapment has been remotely shown as a matter of law. See Mathews v. United States, 485 U.S. 58, 63 (1988) ("[t]he question of entrapment is generally one for the jury, rather than for the court"). As to the second defense, defendants, as already discussed, have utterly failed to meet their heavy burden of establishing outrageous conduct. As to

---

it need not reach them, because defendants lack standing to enforce the MLAT treaty or to challenge international law enforcement coordination. See United States v. Rommy, 506 F.3d 108, 129-30 (2d Cir. 2007).

6

the third defense (that the Government has failed to prove an element of a federal statute), the Second Circuit has refused to dismiss indictments "when there is any link between the federal element and a voluntary, affirmative act of the defendant. Thus, when confronted with situations in which (i) the [Government] introduces a federal element into a non-federal crime and (ii) the defendant then takes voluntary actions that implicate the federal element, . . . federal jurisdiction has not been improperly manufactured." Id. at 1066 (internal quotation marks omitted); see LaPorta, 46 F.3d at 154 (rejecting claim of manufactured jurisdiction where "defendants themselves committed the substantial jurisdictional act of burning the government [car]") (citation and internal quotation marks omitted); United States v. Lau Tung Lam, 714 F.2d 209, 211 (2d Cir. 1983) (rejecting claim of manufactured jurisdiction where defendant "himself committed the substantial jurisdictional act of bringing drugs into the United States").

Here, as already noted, the Indictment charges defendants with voluntarily conspiring to sell millions of dollars worth of weapons to the FARC, with the expectation that those weapons would be used to kill United States nationals, as well as taking active steps towards consummating that sale (including receipt of laundered monies from New York). Thus, as charged, defendants unquestionably took "voluntary actions that implicate the federal element[s]" of the charged crimes, which is enough for jurisdictional purposes. See Wallace, 85 F.3d at 1066.

Defendants next contend that there was an insufficient nexus

7

between defendants and the United States, such that prosecuting them here violates their Fifth Amendment due process rights. "In order to apply extraterritorially a federal criminal statute to a defendant consistent with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." United States v. Yousef, 327 F.3d 56, 111 (2d Cir. 2003) (citation omitted). This nexus requirement "ensures that a United States court will assert jurisdiction only over a defendant who should reasonably anticipate being haled into court in this country." United States v. Klimavicius-Viloria, 144 F.3d 1249, 1257 (9th Cir. 1998).

In Yousef, defendants were charged with "conspir[ing] to attack a dozen United States-flag aircraft in an effort to inflict injury on this country and its people." 327 F.3d at 112. The Second Circuit held that, under those facts, the nexus requirement was satisfied, and that assertion of jurisdiction over the defendants was "entirely consistent" with due process. Id. Here, defendants are charged with conspiring to sell weapons to the FARC in an effort to inflict injury on the United States and its people. Thus, while defendants here may be the arms suppliers, rather than the attackers as in Yousef, nevertheless, "[g]iven the substantial intended effect of their attack on the United States and its citizens, it cannot be argued seriously that the defendants' conduct was so unrelated to American interests as to render their prosecution in the United States arbitrary or fundamentally unfair." Id.

Although defendants contend that "because the Government

8

itself lured [defendants] into engaging in the [charged] conduct," a sufficient nexus between defendants and the United States is lacking, see Al Ghazi Mem. at 21, such an argument does not render Yousef inapplicable, but instead merely suggests once again the possibility of an entrapment defense to be litigated at trial. See Government's Memorandum in Opposition to Defendants' Motion to Dismiss and for Other Relief ("Gov't Mem.") at 11.[4]

Defendants still further argue that there was "no reason to expect that U.S. law would by violated" by the conduct charged in the Indictment. Al Ghazi Mem. at 23. This argument merits little discussion. Although it is well-established that "[n]o man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed," United States v. Lanier, 520 U.S. 259, 265 (1997), defendants surely cannot suggest that they "ha[d] suddenly learned that mass murder was illegal in the United States or anywhere else." United States v. Bin Laden, 92 F. Supp. 2d 189, 218 (S.D.N.Y. 2000). Indeed, agreeing to sell weapons to a terrorist organization with the express purpose of killing innocent civilians unquestionably violates the laws of all civilized nations, which uniformly punish, prosecute, and condemn terrorist violence. See id.

---

[4] Defendant Al Ghazi also argues that "application of these criminal laws" to him is "arbitrary and fundamentally unfair," because his only mistake was to "answer his front door in Lebanon and make the lifetime mistake of inviting a DEA informant into his home." Memorandum of Law of Defendant Tareq Mousa Al Ghazi in Reply to the Government's Response, at 8-9. As noted, this argument may suggest the possibility of an entrapment defense, but falls far short of implicating dismissal of the Indictment, particularly given the allegations that Al Ghazi took active, affirmative steps towards consummating the arms transaction.

9

at 218 n.55.

Finally, defendants argue that the Indictment should be dismissed because their extradition — which was duly ordered after contested proceedings before the courts of Spain and Romania — was based on materially false and misleading affidavits in violation of principles of due process.[5]  It is well-established, however, that "the manner in which an indicted individual comes before a court does not affect the court's jurisdiction." United States v. Awadallah, 202 F. Supp. 2d 17, 41 (S.D.N.Y. 2002).  This principle "rest[s] on the sound basis that due process of law is satisfied when one present in court is convicted of [a] crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards." Frisbie v. Collins, 342 U.S. 519, 522 (1952).  Thus, even assuming that defendants were extradited on the basis of affidavits that were (allegedly) materially false or misleading, "the Government's power to prosecute [defendants] is not impaired by the illegality of the method by which it acquire[d] control over [them]." United States v. Reed, 639 F.2d 896, 901 (2d Cir. 1981).

Moreover, "[a]s the Supreme Court has long observed, absent explicit treaty language conferring individual enforcement rights, treaty violations are generally addressed by the signatory sovereigns through diplomatic channels." United States v. Rommy, 506 F.3d 108,

---

[5] The allegedly false or misleading statements were, in essence, the drawing of inferences by the agents who submitted the affidavits, a routine practice that, it is doubtful, would support defendants' claims in any event.

10

129 (2d Cir. 2007). Defendants, however, have failed to point to any language in the relevant extradition treaties that confer such rights. Although exceptions to this general rule have been made in the case of shocking and outrageous government conduct, see United States v. Toscanino, 500 F.2d 267 (2d Cir. 1974), false or misleading affidavits unquestionably do not amount to "the type of violent or inhumane treatment of defendant[s] that has led courts in the past to dismiss indictments" in such circumstances. United States v. Herbert, 313 F. Supp. 2d 324, 331 (S.D.N.Y. 2004) (noting that such conduct includes torture and brutality, but not "abduction alone"); see United States v. Broward, 594 F.2d 345, 351 (2d Cir. 1979) (reversing dismissal of indictment, where, despite allegations of false material in affidavits for arrest and search warrants, "there was no finding of widespread or continuous official misconduct of the dimensions necessary to warrant imposition of the sanction of dismissal").

Accordingly, defendants' motion to dismiss the Indictment in its entirety must be denied.[6]

Defendants also move to dismiss one or more individual counts of the Indictment. As to Count 1, which charges a conspiracy to kill United States nationals in violation of 18 U.S.C. § 2332(b), defendants argue that the Indictment fails to allege sufficient facts

---

[6] Defendants also contend that a pre-trial hearing should be conducted to develop a "factual predicate" for defendants' various due process arguments. Al Ghazi Mem. at 23-24. Because particularized allegations in the defendants' affidavits do not evidence a due process violation, and jurisdiction over defendants is otherwise proper, such a hearing is unnecessary.

11

to demonstrate that defendants joined the conspiracy with the specific intent to commit the underlying substantive offense.

Pursuant to Fed. R. Crim. P. 7(c)(1), an indictment must include "a plain, concise, and definite written statement of the essential facts constituting the offense charged." It is well-established, however, that an indictment is sufficient so long as it (1) contains the elements of the offense charged and informs a defendant of the charge he or she must meet, and (2) enables a defendant to plead double jeopardy in future prosecutions for the same offense. Hamling v. United States, 418 U.S. 87, 117 (1974); see United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998). In light of this principle, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." Alfonso, 143 F.3d at 776 (citation omitted); see United States v. Walsh, 194 F.3d 37, 45 (2d Cir. 1999) (noting that the Second Circuit has "repeatedly refused, in the absence of any showing of prejudice, to dismiss . . . charges for lack of specificity") (citation and quotation omitted).

Here, Count 1 not only tracks the language of the relevant statute, compare Indictment ¶¶ 9-10 with 28 U.S.C. § 2332(b), but also alleges in some detail the time, place, and manner in which defendants engaged in the charged conspiracy. See, e.g., Indictment ¶¶ 11(a)- (g), (o), (p), (z), (aa), (cc), (ff), (hh) (overt acts in February through May, 2007, relating to defendants' procurement of weapons to be used to kill United States nationals); id. ¶ 11(r) (Al Ghazi's receipt of money, in the presence of Al Kassar and Godoy, for

12

his participation in the charged conspiracies); id. ¶¶ 11(s), (v), (z), (ee) (defendants' meetings and communications concerning their assistance with the FARC's mission to kill United States nationals); id. ¶¶ (u), (w), (ii), (kk), (nn), (xx), (cc) (Al Kassar's and Godoy's receipt of partial payment for weapons); id. ¶ 11(tt) (Godoy's coordination of transporting the weapons); id. ¶ 11(ddd) (Godoy's and Al Ghazi's travel to Romania in connection with the weapons transaction in June 2007). These particularized allegations (including no fewer than 58 overt acts), and numerous others, are more than "sufficient to provide [each] defendant with adequate notice of the charges, allow [each] to prepare his defense, and ensure that [each defendant is] not prosecuted based on evidence not presented to the grand jury. Walsh, 194 F.3d at 45. More generally, although defendants argue that "there exists a palpable disconnect between the sale of the weapons and the purpose for which the purchasers of those weapons sought to use them," thus rendering Count 1 insufficient to support the allegation that defendants had the specific intent to kill United States nationals, see Memorandum of Law of Luis Felipe Moreno Godoy ("Godoy Mem") at 3-4, in actuality any fair reading of Count 1 shows defendants' knowing intent to participate in every aspect of the charged conspiracy. For pleading purposes, this is more than sufficient. United States v. Hernandez, 980 F.2d 868, 871 (2d Cir. 1992); see United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992) ("an indictment must be read to include facts which are necessarily implied by the specific allegations made") (citation omitted). Accordingly, defendants'

13

motion to dismiss Count 1 must be denied.

Defendants' arguments as to Count 2 are equally unavailing. Count 2 charges defendants with conspiring to kill officers and employees of the United States in violation of 18 U.S.C. § 1114. Defendants contend that, unlike the statutes involved in most of the counts of the Indictment, section 1114 does not include an express provision for extraterritorial application, and that, accordingly, Count 2 should be dismissed for lack of jurisdiction.[7] Although there exists a "legal presumption that Congress ordinarily intends its statutes to have domestic, not extraterritorial, application," Small v. United States, 544 U.S. 385, 388-89 (2005), that presumption does not apply "to criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself." United States v. Bowman, 260 U.S. 94, 98-99 (1922). Accordingly, "[s]tatutes prohibiting crimes against the United States government may be applied extraterritorially even in the absence of 'clear evidence' that Congress so intended." United States v. Gatlin, 216 F.3d 207, 211 (2d Cir. 2000).

The statute in question here explicitly punishes those who kill or attempt to kill "any officer or employee of the United States or of any agency in any branch of the United States Government

---

[7] Defendants also contend that extraterritorial application of sections 1114 (Count 2), 2332g (Count 3), and 2339B (Count 4) violates the Due Process Clause, because there is an insufficient nexus between defendants and the United States. As already discussed above, however, this argument is without merit.

14

(including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties."  18 U.S.C. § 1114.  It is beyond question that the United States Government has a strong and legitimate interest in protecting its officers and employees performing official duties abroad.  Thus, this statute, on its face, is clearly aimed at the Government's right to defend itself, and unquestionably prohibits a "crime against the United States Government."  See Bin Laden, 92 F. Supp. 2d at 202; see also United States v. Benitez, 741 F.2d 1312 (11th Cir. 1984).  Nothing in the text or legislative history of section 1114 suggests otherwise.  Accordingly, extraterritorial application of section 1114 is proper, and defendants' motion to dismiss Count 2 for lack of jurisdiction must be denied.  See Bin Laden, 92 F. Supp. 2d at 202 (noting that section 1114 "is explicitly intended to protect vital United States interests, . . . a significant number of United States officers and employees perform their official duties in places outside the United States, and . . . foreign nationals are in at least as good a position as are United States nationals to kill or attempt to kill United States officers and employees").

As to Count 3, which charges that defendants conspired to acquire and use anti-aircraft missiles in violation of 18 U.S.C. § 2332g, defendants contend that the facts alleged therein fall within section 2332g's exclusion for "conduct by or under the authority of the United States or any department or agency thereof."  18 U.S.C. § 2332g(a)(3)(A).  The argument — which would render nugatory any

15

"sting" operation or use of confidential informants to detect violations of this statute —— is, frankly, frivolous. Nothing on the face of the Indictment indicates that defendants' conduct was authorized by the United States. Indeed, to the contrary, Count 3 explicitly charges that defendants conspired to acquire anti-aircraft missiles in order to "enable the FARC to attack United States helicopters in Colombia," Indictment ¶ 18, conduct that in no way was "authorized" by the United States Government. That the confidential informants dealing with defendants were acting at the direction of the Government does not change this fact; indeed, the Indictment makes clear that defendants believed those individuals to be acting on behalf of the FARC, not the United States Government. See, e.g., Indictment ¶¶ 11(b), (p), (s). Accordingly, defendants' motion to dismiss Count 3 must be denied.

Lastly, defendants move to dismiss Count 4, which charges that defendants conspired to provide material support or resources to designated terrorist organizations in violation of 18 U.S.C. § 2339B. Defendants contend that because section 2339B does not require a showing of specific intent to further the illegal activities of a foreign terrorist organization, it violates the due process clause of the Fifth Amendment. See Scales v. United States, 367 U.S. 203, 200 (1961) (holding that a statute criminalizing membership in an organization offends due process if it "impermissibly imputes guilt to an individual merely on the basis of his associations and sympathies, rather than because of some concrete personal involvement in criminal conduct").

16

Section 2339B, however, does not criminalize mere membership in a terrorist organization. Instead, in order to violate Section 2339B, a defendant must "provide material support" to a designated terrorist organization, and have knowledge that the organization in question "is a designated terrorist organization" or "has engaged or engages in terrorism." Thus, because Section 2339B does not criminalize guilt by association, Scales and its "personal guilt" standard are not implicated. See United States v. Paracha, No. 03 CR. 1197, 2006 WL 12768, at *28 (S.D.N.Y. Jan. 3, 2006) (holding that Section 2339B does not violate principles of due process, and noting that "[b]y criminalizing the conduct of providing material support to any organization that is properly designated a foreign terrorist organization, and not the mere association with those organizations, [Section 2339B] properly focuses on the personal action of the individual"). In accordance with the overwhelming majority of federal courts in this country, see United States v. Warsame, 537 F. Supp. 2d 1005, 1021 (D. Minn. 2008), the Court thus finds that Section 2339B satisfies the due process requirement of personal guilt. Accordingly, defendants' motion to dismiss Count 4 must be denied.

For the foregoing reasons, the Court, by Order dated September 5, 2008, denied the defendants' motions to dismiss. The parties are once again reminded that the trial in this matter is firmly and unalterably scheduled to commence on November 3, 2008, at 9:00 am.

_____
JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
       October 14, 2008