UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

**UNITED STATES OF AMERICA**

    v.                                           **No. 07-CR-0354 (JSR)**

**MONZER AL-KASSAR,**

                                               **REPLY MEMORANDUM**

        Defendant.

_____

**The Offense Herein**

      In the letter in opposition to the instant motion, the prosecution claims many times that Mr. Al-Kassar hated the United States, and desired to kill Americans. This was all based on recorded statements made to informants purporting to be members of the FARC. As noted by this Court at the sentencing, Mr. Al-Kassar was just saying what he thought these men wanted to hear. In response to prosecution claims that he wanted to know if the people he was dealing with were against the US because he himself was anti-American, this Court said, "I don't draw the same inference… [M]y own view of it was … that Mr. Al-Kassar wanted to test out his prospective purchasers as to what view he should adopt." (Sentencing Transcript, at 36)

      This Court recognized that, while the offense was a serious one, Mr. Al-Kassar was not motivated by a desire to support terrorism, or anti-American sentiments, but by the desire to make money. (Sentencing Transcript, at 5, 36, 54.) The Opposition letter also noted that Mr. Al-Kassar at one point sold arms at the behest of the *American* government (to the contras in Nicaragua.) Without minimizing the seriousness of the offenses of conviction, it can be said that many governments and non-state actors, certainly including the United States, have sold weapons to those engaging in terrorist acts, and the legal lines can be very blurry.

The Opposition letter cites as criminal history instances of acquitted conduct, which this Court expressly noted was *not* being considered with regard to the sentence here. (Sentencing Transcript, at 42.)

This Court also noted that Mr. Al-Kassar had provided substantial assistance to the Spanish government, and out of respect to that government's wishes, Your Honor was declining to impose what you considered to be a life sentence – 35 years or more. There was a mandatory minimum of 25 years in this case, and this Court imposed a 30 year sentence. At this point, based on Mr. Al-Kassar's age, medical conditions, and the threat posed to him by the virus, that is likely to constitute the life sentence the Court did not wish to impose.

**The Instant motion**

On Page 8 of the Opposition, the prosecutor seems to imply that Mr. Al-Kassar is choosing to be deported to Syria so that he could re-establish his arms trafficking business. This is not the case – Mr. Al-Kassar was born in Syria and has Syrian citizenship – he does not have citizenship in any other country, although he at one point was granted permanent residence status in Spain. It is not clear that Petitioner has any options as to where to go other than Syria – if Spain is an option, he would probably be happy to go there instead. He does not wish to re-establish this business, or engage in any illegal activity, but, at the age of 74 and in poor health, Mr. Al-Kassar simply wishes to live his remaining years with his family.

The Opposition then mentions the general Affidavit from Dr. Brie Williams, and notes that she never evaluated Mr. Al-Kassar, claiming that this renders her Affidavit unhelpful. The prosecution fails to consider that Dr. Williams' Affidavit specifically states that diabetes, hypertension and hyperlipidemia, all of which Mr. Al-Kassar clearly suffers from, put people at much greater risk if exposed to the virus. (Exhibit "A," at 4) Dr. Williams also noted that those

over 50 years old also are at higher risk – Monzer Al-Kassar is 74, and his age puts him at very high risk, especially in a prison environment, where people age faster, and where social distancing is impossible. (Exhibit "A," at 4-7)

With regard to the Report from Dr. Bryan Kutz, the prosecutor says that he has not set forth his history in evaluating compassionate release applications. That is because compassionate release applications were entirely up to the BOP until the passage of the First Step Act, and thus these court cases are a new phenomenon, beginning in 209.

**Extraordinary and Compelling Reasons for Compassionate Release**

The Opposition claims, on Page 9, that Mr. Al-Kassar has not shown the existence of any extraordinary and compelling circumstances warranting relief herein. When undersigned counsel began working on his motion, the pandemic had not yet begun, and it is submitted that even at that time, his age and medical conditions fit the definition of extraordinary and compelling reasons under USSG B.3, Application Note One. With the increasingly dangerous spread of the virus in prisons across the country, many courts have been recognizing that this is, for those at high risk, an *additional* extraordinary and compelling reason justifying compassionate release.

While USP Marion may not yet have any known cases, every day there are new cases in new BOP facilities, and we should not have to wait until the virus shows up in a particular prison. By then, it may be too late for those who risk death if exposed. And with regard to the concern that Syria (which has only 42 known cases as of April 22) may in the future have a large outbreak, the difference is that, in Syria, Mr. Al-Kassar would be able to shelter in place with his family. In prison, that is impossible.

In arguing the lack of any extraordinary and compelling reasons for granting compassionate release, the Opposition seems to be looking at each reason in isolation, rather than

in combination – ie saying, on Page One, that age alone does not suffice. Interestingly, the Opposition cites this Court's decision in *United States v. Haney*, 202 US Dist. LEXIS 6397(SDNY 2020), for that proposition. In *Haney,* supra, this Court denied release to a sixty-one year-old with no risk-inducing medical conditions, noting that he did not meet *any* of the CDC criteria for high risk from the virus. In contrast, Monzer Al-Kassar meets *several of the CDC criteria*- he is well older than 65, and he suffers from diabetes, hypertension and hyperlipidiemia, all of which are noted risk factors. See https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html

**The Measures Taken by the Bureau of Prisons are Severely Inadequate**

The Opposition then discusses the measures taken by the Bureau of Prisons (BOP) to deal with the virus, noting attempts to screen new inmates, sanitize common areas, etc, and the BOP's Six Phase plan to try to restrict the spread of the virus.

However, despite the best efforts of the BOP, this virus has been continuing to spread through more and more facilities, with a sharp rate of increase in the number of cases over time. See *Forbes,* "Federal Bureau of Prisons Institutions not Showing any Sign of Flattening Curve,". https://www.forbes.com/sites/walterpavlo/2020/04/15/federal-bureau-of-prisons-institutions-not-showing-any-signs-of-flattening-curve/#6497965a54dd.
(In fact, it can be seen from the graph below that the curve has been getting steeper over the last couple of days.) At Page 5, the article states, "More inmates are sick than the BOP is reporting and more inmates are not reporting that they are sick out of fear of being identified as sick."

See below for a graph created by undersigned counsel, which tracks the *reported cases* each day. As noted by the Federal Public Defender office and some media reports, however, it appears that there are more documented cases than those reported by the BOP each day.

The Federal Public Defender office stated on April 22, on the main page of its website, "There is good reason to believe that the numbers reported by the BOP understate the actual number of tested-positive cases. *Compare* M. Licon-Vitale, MCC Ward, and D. Edge, MDC Warden, *Response to EDNY Administrative Order 2020-14* (Apr. 7, 2020) *at* https://www.nyed.uscourts.gov/pub/bop/MDC_20200407_042057.pdf (3 positive inmates at MDC Brooklyn) *with COVID-19 Cases* Federal Bureau of Prisons (Apr. 7, 2020) *at* www.bop.gov/coronavirus (2 positive inmates at MDC Brooklyn)."



An recent *Chicago Sun Times* article reported that the number of documented cases at Chicago MCC was higher than the numbers reported by BOP, and that after this was publicized,

5

BOP altered their numbers to reflect the reality on the ground.

https://chicago.suntimes.com/coronavirus/2020/4/18/21225747/coronavirus-cases-rising-chicago-federal-jail

 This undercounting squares with what undersigned counsel has noticed while tracking the reported numbers at each BOP facility each day. There were many times when the reported numbers would decrease, sometimes greatly, at a given facility from one day to the next. For example, on April seventeenth, BOP reported that *50* inmates at FCI Burner Medium had tested positive; then on April eighteenth, BOP reported that only *28* inmates had tested positive at that same facility. Given that almost no one is being transferred at this time, and releases are mainly happening from halfway houses and some camps, it is unclear why this discrepancy occurred, but one thing it means is that the total number reported for that day will be 23 less than it would otherwise be. When adding back in those subtracted in this fashion, there would have been 503 inmates testing positive on April eighteenth, rather than the 479 reported by BOP. It is also noted that BOP reported a total of 473 positive inmates on April 16, yet only 465 on April 17 – maybe many had been released during that 24 hour period but it is impossible to know.

 On April 14, federal correctional officers at FCI Tallahassee filed an OSHA complaint, alleging that the BOP's failure to protect them from the virus put them in imminent danger. https://www.tallahassee.com/story/news/politics/2020/04/18/correctional-officers-file-complaint-coronavirus-tallahassee-federal-prison/5152879002/

 In addition to there being more *documented* cases than those reported by BOP, it is also clear that, as is true also in many other places, the true number of cases is much higher due to a lack of testing. See *Cleveland.com,* "Judge grills federal prisons lawyer on lack of coronavirus tests at Ohio facility in wake of Trump's claim that 'anybody' can get

tested," April 19, 2020, https://www.cleveland.com/court-justice/2020/04/judge-grills-federal-prisons-lawyer-on-lack-of-coronavirus-tests-at-ohio-facility-in-wake-of-trumps-claim-that-anybody-can-get-tested.html

BOP's inability or unwillingness to properly deal with the pandemic is also discussed in *United States v. Scparta*, 18-cr-578 (SDNY April 19, 2020) which notes that people who were approved for home confinement were put into a "14-day quarantine" which was not a proper quarantine, nor limited to 14 days. The inmates in "quarantine" were placed in close contact with one another, and when one then tested positive, the facility (FCI Butner) then just started the 14-day period over again, a process that seems likely to be repeated over and over. The court stated:

> "Mr. Scparta remains in regular and close contact with other inmates and prison staff… He lines up with other inmates in close proximity in order to receive food and medication multiple times per day. He also shares communal spaces like toilets, sinks, and showers with dozens of other people. …[H]e shares his cell with another prisoner.
> ***
> The Court speaks in stark terms: this is an illogical and self-defeating policy that appears to be inconsistent with the directive of the Attorney General [regarding home confinement], ungrounded in science, and a danger to both Mr. Scparta and the public heath of the community."
> Scparta, supra, at 4, 6.

While Mr. Al-Kassar is not eligible for home confinement, in the Communications Management Unit where he is incarcerated in Marion, IL (which fortuitously does not have any *reported* cases *as of yet*) he is subjected to the same conditions described in *Scparta* – he is in regular, close and unavoidable contact with both other inmates and staff, and if any one of them is somehow exposed to the virus, they will all be at risk.

**Recent Cases**

Since this motion was filed on April 3, 2020, there have been many new decisions, including many in this district, granting compassionate release based on the risk posed by COVID-19 and other factors. Several of the cases involved very serious, violent crimes. See, i.e.,

7

*United States v. Zukerman*, 2020 US Dist. LEXIS 59588 (SDNY April 3, 2020); *United States v. McCarthy*, 2020 US Dist. LEXIS 61759 (SDNY April 8, 2020); *United States v. Hammond*, supra; *United States v. Scparta*, supra; *United States v. Gross*, 2020 US Dist. LEXIS 65758 (April 14, 2020); *United States v. Kataev*, 2020 US Dist. LEXIS 65756 (SDNY April 14, 2020); *United States v. Resnick*, 2020 US Dist. LEXIS 59091 (SDNY April 2, 2020); *United States v. Smith*, 2020 US Dist. LEXIS 64371 (SDNY April 13, 2020); *United States v. Russo*, 2020 US Dist. LEXIS 65390 (SDNY April 14, 2020); *United States v. Gentille*, 2020 WL 1814158 (SDNY April 9, 2020); *United States v. Cosgrove*, 2020 US Dist. LEXIS 66567 (WDWA April 15, 2020); *United States v. Hansen*, 2020 US Dist. LEXIS 61946 (EDNY April 8, 2020); *United States v Sawicz*, 2020 US Dist LEXIS 64418 (EDNY April 10, 2020) (sex offender with hypertension granted compassionate release); *United States v. Asaro*, 2020 US Dist. LEXIS 68044 (April 17, 2020) (organized crime figure who committed violent crime at the age of 77 granted compassionate release); *United States v. Gileno*, 2020 US Dist. LEXIS 67729 (DCT April 17, 2020) (compassionate release based on chronic asthma); *United States v. Wen*, 2020 US Dist. LEXIS 64395 (WDNY April 13, 2020); *Samy v. United States*, 2020 U.S. Dist. LEXIS 66864 (EDMI April 16, 2020); *United States v. Coker*, 2020 WL 1877800 (EDTN April 15, 2020); *United States v Ben-Yhwh*, 2020 U.S. Dist. LEXIS 65677 (DHI April 13, 2020); *United States v. Tran*, 2020 WL 1820520 (CDCA April 10, 2020); *United States v. Joling*, 2020 US Dist. LEXIS 67953 (DOR April 17, 2020); *United States v. Williams*, 2020 US Dist. LEXIS 63824 (NDFL April 1, 2020) (career offender serving life imprisonment for bank robbery released based on age and medical conditions); (*United States v. Burrill*, 2020 U.S. Dist. LEXIS 65774 (NDCA April 10, 2020.)

In *Zukerman*, supra, the court stated:

> "Zukerman is 75 years old and suffers from diabetes, hypertension, and obesity. …
> ***
> First, the Court holds that Zukerman's exhaustion of the administrative process [he moved in court 3 days after submitting a request to the warden] can be waived in light of the extraordinary threat posed – in his unique circumstances – by the COIVD-19 pandemic. Second, although the sentence imposed on Zukerman was wholly warranted, the Court holds that the threat posed by COVID-19, in light of his age and medical status, constitutes an extraordinary and compelling reason to modify Zukerman's sentence.
> ***
> …Although Zukerman's original release date may be far off, the threat of COVID-19 is at his doorstep. …
> ***
> …The CDC has …explained that individuals over the age of 65 and people of any age who have serious underlying medical conditions, including heart conditions, diabetes, and obesity, are at higher risk for severe illness from COVID-19. …
> ***
> The Government argues that Zukerman is not an appropriate candidate for release considering the seriousness and duration of his criminal conduct. … The Court does not disagree that Zukerman's misconduct was egregious. As the Court observed at sentencing, 'Zukerman … was driven not by need, but by unmitigated greed. He entangled himself in a web of lies and deceit… Zukerman thought himself to be above the law.' *The severity of Zukerman's conduct remains unchanged. What has changed, however, is the environment where Zukerman is serving his sentence. When the Court sentenced Zukerman, the Court did not intend for that sentence to 'include incurring a great and unforeseen risk of severe illness of death' brought on by a global pandemic.* [US v] *Rodriguez,* 2020 US Dist LEXIS 59588, at 12." *Zukerman*, at 2, 4, 11-12, 15-16, emphasis supplied.

The prosecution argues that many of the cases cited in the original memorandum did not involved violent crimes. However, *Asaro, McCarthy*, *Williams,* and *Hammond* all involve lengthy sentences, not due to end any time soon, imposed for violent crimes. *Asaro* involved a high level organized crime figure who had lived a life of violence – that court stated:

> "In 2012, Asaro, a high-level member of the Bonanno Family – was driving in Howard Beach when another driver cut him off in traffic. … Asaro followed the other driver, obtained his license plate information, and subsequently either asked or directed Bonanno Family associates to … set the car on fire. … His associates did indeed burn the car. … Asaro *was 77 years old when he committed this crime and 82 years old at sentencing*… …I sentenced Asaro to *96 months* imprisonment….
> …I found [at sentencing] '…that Mr. Asaro ha[d] lived a life of violence.' … I also considered 'Asaro's poor health and advanced age,' which I found to be significant mitigating factors. …

9

\*\*\*

…In January, 2020, the … BOP… found that Asaro satisfied the BOP's definition of an elderly inmate with medical conditions… Nonetheless… [the BOP] determined that his 'release at this time would minimize the severity of his offense and pose a danger to the community.'

\*\*\*

The COVID-19 crisis poses an additional risk to Asaro. …

\*\*\*

…I find that Asaro's medical condition constitutes an extraordinary and compelling reason for release. … His condition… 'substantially diminishes [his] ability to provide self-care within the environment of a correctional facility…

Asaro's age, in combination with his deteriorating health, also constitutes an extraordinary and compelling reason for release…

In addition, the combination of the COVID-19 health crisis and Asaro's age and pre-existing medical conditions constitutes an extraordinary and compelling reason for his release. … *While I acknowledge that, as of this writing, no confirmed cases of COVID-19 are present at Springfield, I cannot conclude that no cases are, in fact, present, without assurances that the BOP is routinely testing everyone within the facility.*

\*\*\*

…I must consider the 3553(a) factors and…determine [if] '…the defendant is… a danger to the safety of any other person or the community…'

*Undoubtedly, these considerations largely militate against Asaro's release, and they weigh heavily.* … [H]is actions amounted to 'a senseless act of violence.'

\*\*\*

I expressed a concern that, even at a relatively old age and already suffering from some health conditions, *Asaro 'continued to wield the power to direct or request other people to carry this act out*.' … …I did not believe that time in prison would rehabilitate him or deter him from committing crimes in the future, considering his life-long membership in the mafia…

Although these considerations are largely the same today, the analysis has changed to some extent. While I do not know whether Asaro currently has the ability to command others in his organization to carry out criminal acts at his will, I do not believe that, given Asaro's current state, his release would put the public at danger…

…At sentencing, *I intended to impose an above-Guidelines sentence – not a death sentence.* … If Asaro were to remain in detention, he would face a significant risk of contracting – and suffering severe complications from, and perhaps even dying from – COVID-19. I do not believe that continued detention, in light of this risk, is an appropriate or proportionate way to further the purposes of sentencing. …" *Asaro*, at 1-4, 7-8, 15-16, 18-21, emphasis supplied.

Like Asaro, Monzer Al-Kassar suffers from serious, chronic medical conditions, and meets the requirements for compassionate release even without consideration of the risk posed by COVID-19. Like Asaro, he is in a facility with no *known* cases of COVID-19. He has served

13 years, while Mr. Asaro has served less than 5 years of his sentence. Unlike Mr. Asaro, Mr. Al-Kassar is *not* a member of a well-known Mafia Family, and, contrary to the claims of the prosecution, does *not* pose a risk to the public or continue to direct a large network of associates. (Were that the case, it is highly unlikely that he would have chosen undersigned counsel, a solo practitioner in upstate New York with limited federal experience and no prior experience in the Southern District of New York, to represent him.) The resources remaining to him will instead allow him to live his remaining time in retirement with his family.

In *United States v. Williams*, supra, the court granted release to a career criminal with a long history of committing violent crimes, stating:

> "Unfortunately, in the context of institutional confinement, social distancing can be nearly impossible…given the large number of inmates held together… …[C]ourts around the country have recognized that the *risk of COVID-19 to people held in jails and prisons 'is significantly higher than in the community, both in terms of risk of transmission, and harm to individuals who become infected.'* See *Basank v. Decker*, 2020 US Dist. LEXIS 53191…at 3 (SDNY March 26, 2020)…
> ***
> The Court next considers whether Williams presents 'a danger to the safety of any other person or to the community…
> …[T]he Court cannot conclude, as Williams argues, that he poses no risk at all to public safety – based on the nature and circumstances of his offenses, the weight of the evidence presented at trial, and his lengthy criminal history involving similar offenses. However, given Williams' age, serious health problems, the substantial amount of time he has already served [about 15 years] and his exemplary prison record, factors which are now part of his history and characteristics, the court finds that the risk of him engaging in further criminal conduct is minimal…
> Here, there can be no doubt that Williams' offenses of conviction – again, armed bank robbery, brandishing a firearm during a crime of violence, and possessing a firearm as a felon – were very serious. *The seriousness of those offenses is compounded by the fact that he committed them after six prior convictions for armed bank robbery, all of which resulted in lengthy terms of imprisonment that failed to deter him from continuing the same criminal conduct…*
> ***
> …Williams has served much of his sentence while seriously ill and in physical discomfort. 'This means that his sentence has been significantly more laborious than that served by most inmates…' See *United States v. McGraw*, 2019 US Dist. LEXIS 78370… at 5 (SDIN 2019)…

11

> …[T]he Court finds that extraordinary and compelling reasons warrant a reduction of Williams' sentence...." *Williams,* supra, at 5, 8-12, emphasis supplied.

Mr. Al-Kassar has served only slightly less time already than Mr. Williams and like him, he was ill and in severe discomfort for most of that time (not to mention having been assaulted 3 times) so his time has been more difficult than usual. Unlike Mr. Williams, he does not have a lengthy criminal history, and has no prior history of having been in prison.

In *Hammond*, supra, the defendant, with two prior robbery convictions, was convicted of armed robbery and possession of a firearm by a felon, and sentenced to 355 months (nearly 30 years) – he had served about 15 years of that sentence when he was granted release based on the risk posed to him by COVID-19. Similarly, in *McCarthy*, supra, the defendant was convicted of armed bank robbery after having served a 25 year sentence for a prior conviction – he had served only a small portion of his sentence when released due to the risk from COVID-19.

Like the defendants in *Hammond*, *McCarthy*, *Williams*, *Asaro*, and the other cases cited herein, Monzer Al-Kassar is at serious risk of dying from COVID-19 should he be exposed to it. Unlike those defendants, he has little criminal history, and is not a violent person, despite the nature of his previous business, the majority of which was completely legal. He will be deported upon release from prison, and does not pose a risk to anyone or to the community.

**Exhaustion**

Finally, the Opposition argues that Mr. Al-Kassar has not exhausted his administrative remedies. This Court has held, in *Haney*, supra, and elsewhere, that even the 30 day period after submission of the application to the warden can be waived, due to the extenuating circumstances posed by the pandemic. However, that is not necessary here, as Mr. Al-Kassar filed his application well more than 30 days ago. The Opposition also argues that because the application was filed before the pandemic, he should have filed a new application after the pandemic began

12

so BOP could consider it. This misunderstands the nature of this proceeding, which isn't an *appeal* of what BOP had before it at the time the application was submitted, but a *de novo* proceeding under the First Step Act. Moreover, there are many cases where the application to the warden was filed before the pandemic, and the court granted the motion based on the risk posed by COVID-19. *United States v. Resnick*, supra; *United States v. Kataev*, supra (application filed in December, 2019); *United States v. Cosgrove*, supra (application denied by warden in December, 2019); *United States v. Hammond*, supra (application filed in June, 2019); *United States v. Asaro*, supra (application denied in January, 2020). In *Resnick,* supra, Judge McMahon, Chief Judge of this District, stated:

> "If the Government is suggesting that this court – which has undoubted jurisdiction because Resnick's original application for compassionate release has been exhausted – cannot take into account things that have occurred since February 26 – things that render Resnick's situation even more perilous than it was a month ago, because he has not 'exhausted' those grounds, I am constrained to disagree. I would be a fool not to consider what has happened in this country in the 35 days since Resnick originally applied…" *Resnick*, at 17.

## CONCLUSION

For the foregoing reasons, this Court should reduce Monzer Al-Kassar's sentence to time served based on extraordinary and compelling reasons of the risk posed by COVID19, as well as due to his age and health as provided in USSG 1B1.13 Application Note 1(A) and (B).

Dated: April 23, 2020

                                             Respectfully submitted,

                                             *Kathy Manley*
                                             KATHY MANLEY
                                             Attorney for *Monzer Al-Kassar*
                                             NDNY Bar Roll No. 105730
                                             26 Dinmore Road
                                             Selkirk, NY 12158
                                             (518) 635-4005 (phone and fax)
                                             Mkathy1296@gmail.com